(6 Misc. Rep. 355.)

### KEYES v. KEYES.

(Superior Court of New York City, Equity Term.     December, 1893.)

MARRIAGE—ACTION TO ANNUL—FRAUD.

    Where plaintiff, a confiding young woman, was induced to marry defendant, by representations that he was an honest, industrious man, when in fact he was a professional thief, the marriage will be annulled, on the ground that plaintiff's consent was obtained by fraud.     Code Civil Proc. § 1743, subd. 4.

Action by Eliza Keyes against Benjamin Keyes to annul the marriage on the ground of fraud.     Judgment for plaintiff.

A. P. Wagener, for plaintiff.

McADAM, J.     The defendant, by fraudulently misrepresenting himself as an honest, industrious man, induced the plaintiff, a confiding young woman, to become his wife.     If the misrepresentation had been as to the defendant's social position, rank, fortune, manners, or the like, they would have furnished no ground for declaring the marriage void.     Fabrications and exaggerations of this kind, while not commendable, are so common as to be tolerated by the law on grounds of public policy.     Persons intending to act upon such representations must verify them at their peril, for, though they enter into the inducements to marriage, they are not considered as going to the essentials of the relation, on the theory that the parties take each other for better or worse.     Indeed, in some cases, marriage likens itself to the veritable mouse trap, which is "easier to get into than out."     In this case the defendant represented himself as an honest, industrious man, and appearances favored him, when in truth he was a professional thief, whose picture has a place in the rogues' gallery, and he is now "doing time" in the Clinton prison for crime.     It was an unholy alliance, begotten in fraud, and the plaintiff is the victim.     What fraud, in kind and amount, should be deemed sufficient to annul a marriage, has led to a fruitful amount of discussion and contrariety of opinion.     The statute provides that a marriage may be annulled, where the consent of one of the parties was obtained by force, duress, or fraud, (Code, § 1743, subd. 4,) any one being sufficient. This provision was intended to protect the party imposed upon and to punish the one guilty of the wrong.     The difficulty in inducing courts to act upon this provision is the stupefying fear that dissolution may lead to carelessness and blind credulity on the part of those contemplating marriage.     But "love is blind," always has been, and will be.     Nothing born of the law will prevent indiscreet and unsuitable marriages.     The average individual judges and acts on appearances, on his own likes and dislikes; and if he or

she exercises his or her best judgment, and is deceived by the arts and wiles of an unscrupulous, designing person, there should be no unwillingness, in a proper case, to afford relief to the injured, when it can be done without injury to any one except the guilty.    There can be no consent to a contract unless it be voluntary.    If it be induced by misrepresentation, duress, or constraint, the guilty party will be allowed to obtain no benefit from it.    Kerr, Fraud & M. (Amer. notes by Bump,) 143.    It has been said in some cases that the misrepresentation must be such as to deceive persons of ordinary prudence.    People v. Williams, 4 Hill, 9; People v. Stetson, 4 Barb. 151; People v. Sully, 5 Parker, Crim. R. 142.    But the better rule is that if the pretense is capable of defrauding it is sufficient. Reg. v. Woolley, 4 Cox, Crim. Cas. 193.    The real question is how far the representation affected the mind of the party defrauded, and this is one of fact.    Thomas v. People, 34 N. Y. 351.    In People v. Court of Oyer, 83 N. Y., at page 449, the court held:

"The law was intended to protect the weak and credulous as well as the careful and intelligent, and the materiality and influence of the pretense is for the jury to determine. * * * It is quite as accurate to say merely that the pretense must be calculated to deceive, leaving that to be determined from the circumstances of each particular case."

In all these matters, much is left to the good sense and judgment of the court or jury, if there be one.    Chancellor Kent says, (2 Comm. 77:)

"It is said that error will in some cases destroy a marriage, and render the contract void, as if one person be substituted for another.    This, however, would be a case of palpable fraud, going to the substance of the contract."

In the present instance the plaintiff found, after marriage, that a professional thief had, by fraud, been substituted for the honest, industrious man she was led to believe she had married.    While the cases are dissimilar, the result in either is substantially the same.    Companionship, with its reciprocal duties, is the basis of marriage, and no respectable young woman should be obliged to divide the life companionship of a husband between herself and the penal institutions of the state.    No conception of married life or reciprocal duties would tolerate such a thing.    There could be nothing more degrading in its influence.    Such a husband is not a fit subject for the household, nor one to be looked up to for advice and guidance.    Men may have vices at the time of their marriage, and, if these are dropped at or before the time of their vows, they should not be resurrected, and made the basis of domestic strife, but where they are continued after marriage they may give rise to serious matrimonial difficulties.    In Wier v. Still, (31 Iowa, 107,) a widow induced to marry a "jail bird" by means of false representations as to his respectability was refused relief on the ground of her folly and credulity.    Bigelow, in his work on Fraud, (page 93,) cites the above case "as especially applicable to a widow."    And in Moot v. Moot, 37 Hun, 288, the court, in granting a decree of nullity, was influenced by the fact that the plaintiff was a "school girl,"—distinctions obviously founded more on the judicial policy or discretion of the courts than upon strict legal principles.    They find

warrant in the precept which permits the court or jury to determine in their own way the influence and effect of misrepresentations as applied to the case at hand, and the special equity therein calling for relief; and in this manner the age, experience, and gullibility of the victims play their part. As the plaintiff's age is between that of the school girl and the widow, there would seem to be a discretionary choice of alternatives left for the court to determine which rule it will adopt to satisfy the requirements of this controversy. If the defendant had reformed after marriage, and become exemplary in conduct, the court might have required the plaintiff to overlook the past, and screen it from the world with the mantle of charity, but he has not chosen the pathway of the penitent, and is, in consequence, again under state surveillance, in its penitentiary at Clinton. Consortium and conjugal society have scarcely risen to the dignity of memories. The consequence is not a temporary sorrow, which may be buried under the oblivion of recurring time, or forgotten in the solitude of despair, but an ever-present affront and reproach that "will not down." The fraud perpetrated upon the plaintiff goes to the substance and essence of the contract, and while this may be regarded as an exceptional case, resting on its own peculiar merits, yet, if the statute authorizing a decree of nullity for fraud does not reach such a case, it is difficult to imagine one it is capable of comprehending. There are, fortunately, no children to bear the obloquy of the marriage; and unless a premium is to be placed on fraud, and the guilty taken under the protecting aegis of the law, there is no reason founded on principle or policy why the plaintiff should not have that justice which the decree prayed for will afford. The application must be granted.