## WILLIAM ANDERS *vs.* ELSIE ANDERS.

Hampden.    September 27, 1915. — June 21, 1916.

Present: RUGG, C. J., LORING, CROSBY, PIERCE, & CARROLL, JJ.

*Marriage and Divorce,* Annulment.

Where a woman, who had promised to be a faithful wife, went through a marriage
ceremony solely to secure the right to appear as a married woman and thus to
conceal the fact that she had had an illegitimate child, secretly intending to leave
her husband immediately after the ceremony to go to a foreign country and not
to see him again, and carried that plan into effect, the husband, who was deceived
and acted in good faith, is entitled under R. L. c. 151, § 11, to a decree annulling
the marriage.

LIBEL, filed in the Superior Court on October 18, 1913, under
R. L. c. 151, § 11, to annul a marriage performed on October 16,
1913.

In the Superior Court the case was heard by *Dana,* J., who re-
ported it for determination by this court.    The report was as
follows:

The libellant was a widower, whose wife died some three and
one half years before, leaving two children whose ages were seven
and five respectively.    He became acquainted with the libellee
nearly a year before the hearing, and for about five weeks before
the marriage ceremony employed the libellee as his housekeeper
and to look after his children, and she did this work for about five
weeks.    When she came to work for the libellant, she brought with
her her illegitimate child, about one year and eight months old,
born to her by somebody unknown to the libellant.    Finding the
expense of a paid housekeeper too great, the libellant decided to
break up housekeeping and put the children out to board.    Before
doing this, he suggested to the libellee that it would be better for
both of them to get married, and he proposed marriage, but was
not accepted.    The libellee later was discharged by the libellant,
and moved her trunks to a room in the same city.    About a week
after she left the employ of the libellant, she called on him, and
said that she was willing to be married and that she would be a
good mother to the children and be a good wife.    On the Friday
afternoon preceding October 16, 1913, they both went to the city

clerk of Holyoke and procured a marriage license the following day, and arrangements were made to have the ceremony performed on the ensuing Thursday, October 16, 1913. The marriage ceremony was performed on October 16, 1913, near one o'clock, about one week after making the marriage contract. After the marriage ceremony, they walked from the clergyman's house about a square, which walk did not consume more than five minutes. No trouble arose between them during this walk. As they reached a street corner the libellee stated to the libellant that she wanted to go to the dentist's, and that she would be down at the house about three o'clock. The libellant returned to his home, where his sisters and brothers and a cousin had assembled; they waited until late in the evening, but the libellee did not come there that night, nor has he seen her since. About three weeks after she left him, he received a letter from her from Braunschweig, Germany, where her mother lived, wherein the libellee stated that she did not know what she was doing; that she must have been crazy at the time and that she never would see him again. Before the marriage engagement and during its pendency and before the marriage ceremony the libellee had been making all necessary arrangements to go to Germany. She wanted to go to Germany, but, having a child, inquired of a friend several days before the marriage how she should sign her name, Miss or Mrs., and was told that she would require marriage papers to satisfy the authorities. She stated to this friend that she did not know whether her mother would want her or not. She also stated that she was going to get her ticket perhaps to-morrow, and that she wanted to draw her money out of the bank that day. This was about four days before the marriage but after the marriage contract was entered into. At no time did the libellee intend to comply with her marriage contract as made with the libellant or intend to fulfil the marriage vows and obligations; the marriage contract as made by her and the ceremony performed never were consummated by their living together as husband and wife or ever having sexual intercourse with each other; her only object in getting married was that she could go back to Germany to her mother's with a marriage name and marriage standing on account of her child and herself, or to satisfy the authorities. She married the libellant for the sole purpose of getting a marriage name in order that she might satisfy

her mother that she was married or to satisfy the authorities. She never intended to live with the libellant as his wife or to care for his children or to fulfil the marriage obligations; she entered into the marriage ceremony and had the marriage ceremony performed with intent to defraud and deceive the libellant, and the libellant was deceived and defrauded into marrying the libellee. The libellant did not know of the fraud and deceit practiced upon him, and the contract and ceremony were made and performed on his part in good faith and in the belief that the libellee would fulfil the marriage contract and obligations. At no time of the contract and marriage ceremony did the libellee intend doing so. The contract was fraudulent and the libellant was induced into the marriage contract and to have the same performed by the deceit and the false representation made by her to him that she would live with him as his wife and take care of his children and fulfil the obligations of the marriage contract, and the libellant was misled into the contract of marriage and having the same performed through the misrepresentation and deceit made to and practiced upon him by the libellee.

Notice of the libel was sent to the libellee by registered mail and the receipt was returned in handwriting identified as that of the libellee, and service also was made by publication.

The case was submitted on a brief by the libellant.

*P. H. Sheehan,* for the libellant.

LORING, J. It was decided in *Dickinson* v. *Dickinson,* [1913] P. 198, that wilful and persistent refusal on the part of the wife to allow any marital intercourse was ground for a decree of nullity of the marriage at the suit of the husband. The earlier cases in England had proceeded upon the ground that in such a case incapacity in fact on the part of the wife must be made out to enable the husband to get such a decree. But upon great consideration it was held in that case that the objects for which matrimony exists are as much defeated in case the wife wilfully persists in refusing to have marital intercourse when she can as they are in a case where she is willing but for some reason cannot.

It has been decided here on the authority of the English cases preceding *Dickinson* v. *Dickinson, ubi supra,* that incapacity is ground for a decree of nullity. *S ——— v. S ———,* 192 Mass. 194. That was a case of partial malformation in both the husband and

wife which resulted in incapacity in case of the two. There is an earlier case in this Commonwealth in which it was held that utter denial of marital intercourse was not ground for a decree of nullity. See *Cowles* v. *Cowles*, 112 Mass. 298. In that case no consummation of the marriage had ever taken place. The whole contention was disposed of in that case in less than two lines and in these words: "It plainly does not go to the original validity of the marriage, and affords no ground for declaring the nullity of it." Interpreting the terms of that opinion in the light of the libellant's brief in that case it is pretty plain that in deciding *Cowles* v. *Cowles* this court did not have in mind the case of a woman going through the marriage ceremony with a preconceived intention never to allow marital intercourse.

But however that may be, the facts in the case at bar go far beyond those in *Cowles* v. *Cowles*. In the case at bar the libellee went through the marriage ceremony with an intention never to perform any one of the duties of a wife. She went through the ceremony solely to secure a right to bear the name of a married woman and in that way to hide the shame of having had an illegitimate child, intending to leave her husband at the church door and not see him again. That plan she carried into effect. It is settled that a contract for the sale of goods is induced by fraud and for that reason voidable where the purchaser had an intention when the contract was made not to perform his promise to pay for them. If an intention not to perform his promise renders a contract for purchase of property voidable, *a fortiori* the same result must follow in case of a contract to enter into "the holy estate of matrimony." See generally in this connection *Barnes* v. *Wyethe*, 28 Vt. 41.

Cases, where a defendant in a bastardy complaint goes through the form of marriage with the woman in question to secure his discharge intending never to live with her, well may involve other considerations. See in this connection Bish. Mar. Div. & Sep. § 476, and cases there cited.

We are of the opinion that upon the facts set forth in the report the petitioner is entitled to a decree.

*So ordered.*