Hillsborough, }
March 4, 1919. }

### JOSEPH GATTO *v.* JOSEPHINE GATTO.

If a marriage is entered into in reliance upon the false representations of a woman to her intended husband as to her chastity, and shortly after consummation she discloses to him that she has been guilty of incest with her father for a number of years, the husband is entitled to a decree of nullity.

PETITION, for a decree annulling the marriage of the parties. It appeared that they had been acquainted for about three years before they were married; that the petitioner had repeatedly said to her that his family was a respectable one and he did not desire to bring into the family as his wife a woman whose character was not above reproach; that if she were not such they would go their respective ways, as he would not under any consideration marry her if she were not a chaste and virtuous woman; that she told him and also wrote him to the effect that she was a virtuous girl and that he, relying upon her representations as true, married her on January 7, 1917, whereupon the marriage was consummated. Shortly thereafter she disclosed to him that she had been guilty of incest with her father for a number of years. Thereupon the petitioner left her and has not cohabited with her since. It is found that she made the false representations as to her chastity, concerning which he was ignorant, with the intent to deceive him as to her true character and to induce him to marry her. A decree of nullity was entered, and the defendant filed a bill of exceptions which was allowed at the January term, 1918, of the superior court by *Kivel*, C. J.

*Doyle & Lucier*, for the plaintiff.

*Henri A. Burque*, for the defendant.

WALKER, J.    The claim of the defendant that the court is without jurisdiction to grant a decree of nullity is without merit.    In a case requiring that remedy the power of the court is ample.    *True* v. *Ranney,* 21 N. H. 52; *Bickford* v. *Bickford,* 74 N. H. 448, 453.

According to the law as announced in *Moss* v. *Moss* [1897] P. 263, the plaintiff is not entitled to a decree of nullity.    It was there held that the fraudulent concealment by a woman from her husband at the time of the marriage of the fact of her existing pregnancy by another man does not render the marriage null and void, or afford him any ground for a decree of annulment.    This result was reached by the application of a principle that, while consent is essential to the marriage contract, fraud inducing consent is immaterial.    The court says (*p.* 268): "In the case of duress with regard to the marriage contract, as with regard to any other, it is obvious that there is an absence of a consenting will.    But when in English law fraud is spoken of as a ground for avoiding a marriage, this does not include such fraud as induces a consent, but is limited to such fraud as procures the appearance without the reality of consent," as in case of false personation or of imposition inducing one of feeble mind to enter into the contract which he did not understand.    "In all these, and I believe in every case where fraud has been held to be the ground for declaring a marriage null, it has been such fraud as has procured the form without the substance of agreement, and in which the marriage has been annulled, not because of the presence of fraud, but because of the absence of consent. . . . But when there is consent no fraud inducing that consent is material."

In support of this view the court quotes with approval the language of Sir William Scott in *Sullivan* v. *Sullivan,* 2 Hagg. Cons. 238, 248, where he says: "The strongest case you could establish of the most deliberate plot, leading to a marriage the most unseemly in all disproportions of rank, of fortune, of habits of life, and even of age itself, would not enable this court to release him from chains, which, though forged by others, he had riveted on himself.    If he is capable of consent, and has consented, the law does not ask how the consent has been induced."

The theory of these cases seems to be that marriage between competent parties and in accordance with statutory requirements creates a status, which upon grounds of public policy cannot be annulled. This public policy had its origin in the ecclesiastical courts and is based upon the religious idea that marriage is a sacrament.    While it is admitted that there can be no legal marriage without the agree-

ment of the parties based upon their consent, it is said in substance that a formal consent willingly given though induced by active fraud, does not render the contract void. In a case where duress is practised the argument is that the willing mind is absent and hence there is no contract; as in case of a formal promise to marry one impersonating the one intended, or where the ceremony is performed as a mere matter of amusement or jest with no intention of creating the marriage status, there is no willing mind, but where the marriage status is actually created by the formal, intelligent consent of the parties it is argued that the law precludes any investigation into the inducements that led the parties to assume that relation, in an annulment proceeding; while in an action for breach of promise, such investigation is permitted. In the one case fraud in its usual common-law sense may be a legal defence, while in the other case it is an immaterial circumstance.

It is said that a contract of marriage fully executed results in a peculiar status, which cannot be annulled on the ground of fraud in a material matter practised by one of the parties, at the time the contract was made, upon the other party, who was thereby induced to consent to the formality of marriage; that if the defrauded party having sufficient mental capacity freely consents to the marriage he is *ipso facto* caught in the meshes of an unyielding status from which there is no escape in law. But why is there no legal redress? Why is justice denied him in this situation which the law would be swift to afford him in the case of an ordinary civil contract? The usual answer is that the distinction is based upon grounds of public policy which seeks to render the marriage status permanent and unassailable. But this answer does not fairly meet the issue. It assumes that there is a marriage when one of the parties has not assented to it. If one is compelled by duress to formally assent to a marriage, it is uniformly held that there is no binding contract for want of mutual agreement; it is as though no technical assent had been given; the freedom of mental action upon the subject is suspended. Hence there is no effective contract and no marriage, and public policy does not give vitality to the ceremony; but when one's mind is controlled and influenced by an outrageous fraud perpetrated by the other party and is thereby induced to assent to a formal marriage, it is not apparent why the ceremony is any more effective than in the case of duress, or why public policy should attach different results to the supposed cases which are identical in the entire lack of a free and unrestrained consent. If the formal ceremony of marriage creates

the status without regard to the means used to induce consent, it would seem to follow that a free and intelligent consent is unimportant in any case, and that the final ceremony is the only important element of the marriage contract. But as the status must result from the contract, there can be no status in the absence of a contract, and there can be no contract in the absence of a free and mutual understanding and agreement. There is no public policy which binds parties to contracts they never made either expressly or by reasonable implication.

But it is sometimes argued that in view of the assumed sanctity of the marriage relation and its importance to society and the state, though one may be induced by fraud to agree to the marriage ceremony, he is estopped after that event, upon discovering the fraud, to set it up in a court of equity as a ground for a decree declaring the fraudulent ceremony of no force or effect. This theory is suggested by Bishop (1. Mar. Div. & Sep., s. 460) where he illustrates his view in the case of a man who has been defrauded by the woman, by asserting that "in the act of marriage he says to her, in effect and in law, 'I take you to be my wife . . . whether you have deceived me or not.' In other words, he waives the condition" upon which he agreed to marry her by going through the form of marrying her. While the discovery of the fraud an instant before the ceremony would justify his breach of the previous promise of marriage, his discovery of it an instant after would afford him no grounds for relief, because unconsciously he has precluded himself from taking that position. It is hard to understand the reason for such a rule of law or to explain it by a reference to any sound principle of public policy or good morals, prevailing within this jurisdiction.

It cannot be successfully maintained upon legal principles that the marriage status, inadvertently entered into, instantaneously operates to the advantage of the guilty party and to the serious detriment of the defrauded party, or that the interest of the state is fostered and promoted by such a result. It would seem that public policy would denounce such a proposition as archaic and wholly unsuited to the present state of civilization and the prevailing ideas of juridical justice. It is evident that the doctrine of waiver or estoppel is not applicable in the case supposed. But if it is not tenable in such a case, then it is not true that as a general proposition the fraud of one of the parties, which produces the consent of the other party, furnishes no ground for an annulment of the marriage. The irresistible inference is that it may.

In this country the English rule has not been uniformly followed. Various exceptions have been introduced for the evident purpose of doing justice in the particular case. A leading case in this country is *Reynolds* v. *Reynolds*, 3 Allen 605, the facts of which were substantially the same as those in *Moss* v. *Moss*. In the opinion the court adheres to the principle that fraudulent representation by the woman as to her chastity is immaterial, relating only to an incidental matter so far as the question of annulment is concerned, but makes a distinction between such a case and the case of the fraudulent concealment by the woman from the man of the fact of her pregnancy by another man, existing at the time of the marriage. This fraud, it is said, relates "directly to the essentials of the marriage contract" and is held to constitute a sufficient ground for a decree of annulment. A criticism of this case occurs in the *Moss* case (page 276), where it is said: "I could understand a broad principle that unchastity before marriage should vitiate the contract, . . . on the ground that a man believes he is making a pure woman his wife. . . . But I do not understand why the accidental circumstances — first of misconduct resulting in pregnancy, and, secondly, of that pregnancy continuing to the marriage — should constitute the momentous difference between a valid and invalid marriage." The *Reynolds* case was decided upon the theory that the husband was induced by the fraud of the wife to agree to marry her, that they were married, and that as the fraud related to an essential element of the contract, the marriage was void or voidable. It was unnecessary for the court to state or attempt to decide that previous unchastity not accompanied with present pregnancy would afford the husband no ground for relief. The actual decision does not seem to be open to serious criticism, except from the English point of view as disclosed in the *Moss* case, and as apparently adopted by Bishop. (1. Mar. Div. & Sep. *ss.* 485, 494.)

But the Massachusetts court has taken a further step in the development of the law upon this subject, by holding in *Smith* v. *Smith*, 171 Mass. 404, that a marriage was void for fraud, where the wife before consummation of the marriage relation discovered that the husband was afflicted with a venereal disease, the inference being that if she had not made the discovery until after consummation she would have been without relief. Although she would have been defrauded as much after consummation as before and although her consent to the contract of marriage, in a legal sense, would have been lacking, yet the mysterious sanctity of the consummated marriage estops her from seeking justice on account of the fraud she has inno-

cently suffered. (For a somewhat contrary view see *Crane* v. *Crane*, 62 N. J. Eq. 21.) In other words, it is not the mere status of marriage alone that has that effect, as is often ruled, but the status plus consummation. The old theory is substantially modified, in order, as it would seem, to do justice to the injured party, rather than to apply indiscriminately an ancient doctrine of public policy, which, originating in the ecclesiastical courts, minimizes the importance of the civil contract of marriage and exaggerates its religious character. The Massachusetts cases referred to are evidence that the contractual rights of the parties are deemed to be of some importance even after the status is established.

The only ground upon which the suggested doctrine of consummation becomes of importance is that the possibility of the birth of children establishes a public policy that precludes a decree of nullity for fraud which would bastardize the children. But this consideration does not establish the validity of the marriage as a contract in which consent is essential. If the requisite consent did not exist before, it did not exist after consummation, in the absence of waiver or estoppel in fact. For the same reason it might be said that cohabitation between unmarried persons is in law conclusive proof of a previous marriage. The absurdity of the proposition is even more apparent in a case where the woman is fifty or more years old, or where for a variety of reasons the procreation of children is impossible. When the parties are within the prohibited degrees of consanguinity the marriage is void (*Hayes* v. *Rollins*, 68 N. H. 191) and the children are not protected from the consequences of the non-marriage of their parents. 1 Bish. Mar. & Div. *s.* 754; P. S., *c.* 174, *s.* 3. Why upon principle should they be protected when there was no marriage for want of a mutual contract? See *Anders* v. *Anders*, 224 Mass. 438; *Dickinson* v. *Dickinson*, [1913] P. 198.

That the fraud on account of which the marriage will be set aside must relate to a matter material to the marriage relation which the defrauded party could not in the exercise of reasonable prudence discover at the time, and the effect of which he has not waived when fully informed of it, is a principle readily deducible from many American authorities. It is not exclusively confined to the *essentialia* of the marriage relation as defined in the *Reynolds* case. It may relate to matters not falling within that definition; as when consent is secured through a fraudulent plot (*Ferlat* v. *Gojon*, Hop. Ch. *478; *Barnes* v. *Wyeth*, 28 Vt. 41); by representations of honesty by a professional thief (*Keyes* v. *Keyes*, 26 N. Y. Supp. 910); by the false

assertion of the paternity of a bastard (*Scott* v. *Shufeldt*, 5 Paige 43; *diLorenzo*, v. *diLorenzo*, 174 N. Y. 467; *Barden* v. *Barden*, 3 Dev. 548); by the woman's claim of widowhood when she had been collusively divorced (*Blank* v. *Blank*, 107 N. Y. 91); or by the concealment of the fact that the woman was an epileptic, a statutory ground for divorce (*Gould* v. *Gould*, 78 Conn. 242). See also *Svenson* v. *Svenson*, 178 N. Y. 54; *Ryder* v. *Ryder*, 66 Vt. 158. Cases like the *Reynolds* case, which reach the same result (*Harrison* v. *Harrison*, 94 Mich. 559; *Nadra* v. *Nadra*, 79 Mich. 591; *Carris* v. *Carris*, 24 N. J. Eq. 516; *Baker* v. *Baker*, 13 Cal. 87; *Lyon* v. *Lyon*, 230 Ill. 366; *Morris* v. *Morris*, Wright 630; *Ritter* v. *Ritter*, 5 Blackf. 81), do not hold that fraud in other respects might not be effective. The decisions are obviously sound, though statements in some of the opinions are open to criticism.

In *diLorenzo* v. *diLorenzo*, *supra*, the defendant falsely represented to the plaintiff that on a particular date she had given birth to a child of which he was the father, when the fact was she had not given birth to a child. The plaintiff induced by this representation thereupon married her, but upon discovering the truth ceased to cohabit with her and sought an annulment of the marriage. The supreme court (71 App. Div. 509), in an apparently careful opinion in which many authorities were referred to, denied the application for an annulment upon the ground that the representation did not relate to an essential element of the marriage status. But this holding was reversed in the court of appeals (174 N. Y. 167, 172), where it is said: "It is a general rule that every misrepresentation of a material fact, made with the intention to induce another to enter into an agreement and without which he would not have done so, justifies the court in vacating the agreement. . . . There is no valid reason for excepting the marriage contract from the general rule. In this case, the representation of the defendant was as to a fact, except for the truth of which the necessary consent of the plaintiff would not have been obtained to the marriage. . . . The minds of the parties did not meet upon a common basis of operation."

That there is much conflict in the decisions upon this subject is apparent, which may be explainable as the result of an attempt of some courts to modify or relax as little as possible the ecclesiastical theory of the sacredness of marriage, when in the particular case its inapplicability to modern views of justice to the contracting parties is clear and pronounced.

In New Hampshire, views have been expressed which accord with

those herein entertained. In *Keyes* v. *Keyes*, 22 N. H. 553, it was held that where one of the parties was insane at the time of the marriage and that fact was concealed by the fraudulent practices of the friends of the insane party, the marriage was invalid; the court remarking that, "Fraud is an element which vitiates all contracts, and may be of a character to vitiate, and will vitiate even the marriage contract." To the same effect are *Farmington* v. *Somersworth*, 44 N. H. 589, 590; *Hampstead* v. *Plaistow*, 49 N. H. 84, 98. There is no indication that the fraud here referred to was used in a peculiar or restricted sense. It evidently means fraud as usually understood in its application to contracts generally.

"It is true, that there are some obscure dicta by the earlier commentators on the law, that the marriage of an insane person could not be invalidated on that account; founded on some notion that prevailed in the dark ages, of the mysterious nature of the contract of marriage, in which its spiritual nature almost entirely obliterated its civil character. In more modern times it has been considered in its proper light, as a civil contract, as well as a religious vow; and like all civil contracts will be invalidated by want of consent of capable persons." *True* v. *Ranney*, 21 N. H. 52, 54; *Londonderry* v. *Chester*, 2 N. H. 268, 278; *Clark* v. *Clark*, 10 N. H. 380, 382; *Cross* v. *Grant*, 62 N. H. 675, 684; 2 Kent Comm. 77. As marriage is deemed to be a civil contract and not a sacrament, fraud in a material respect which prevents a substantial meeting of the minds of the parties in an intelligent agreement for marriage cannot be said to be immaterial, or beyond the province of the court to correct by a decree of annulment.

The public policy of this state, evidenced by the statutes, the decisions, or the general consensus of opinion, does not regard a fraudulent marriage ceremony as sacred and irrevocable by judicial action; it does not encourage the practice of fraud in such cases by investing a formal marriage, entered into in consequence of deceit, with all the force and validity of an honest marriage. While marriage is a contract attended with many important and peculiar features in which the state is interested, and while it is one of the fundamental elements of social welfare, its transcendent importance would seem to demand that wily and designing people should find it difficult to successfully perpetrate fraud and deceit as inducements to the marriage relation, rather than that such base attempts should be regarded as of trivial importance and be wholly disregarded by the courts. Unhappy and unfortunate marriages ought not to be encouraged.

Sch. Dom. Rel., *s.* 24. The successful perpetration of fraud is not deemed to be a subject for judicial encouragement (*Lyman* v. *Lyman,* 90 Conn. 399, 411), nor is the court authorized to legislate in favor of such a policy.

In Reeve, Dom. Rel. 206, the following significant language is used: "If it be founded in justice, that the contracts which respect ordinary matters, should be treated as void, when obtained by fraudulent practices, why then should a contract, the most important that can be entered into, be deemed inviolable, when obtained by such fraudulent practices? A man, by the foulest fraud, gets into possession of the property of his neighbor. By a contract thus basely obtained, it not only renders the contract void, but, in many instances, is a felony. The common sense of mankind must revolt at the idea, that when a man, by the same abominable fraud, obtained the person of an amiable woman, and her property, that the law should protect such contract, and give it the same efficacy as if fairly obtained. . . . There is no more reason for sanctioning a marriage procured by fraud, than one procured by force and violence. The consent is as totally wanting, in view of the law, in the former, as in the latter case."

Neither the restricted rule of law as administered in England, nor the Massachusetts modification of it which has been sanctioned in some other jurisdictions, is supported by convincing legal reasoning, or justified by a sound public policy. The law does not require that the parties should take each other "for better or for worse," as is assumed by some writers (*Scroggins* v. *Scroggins,* 3 Dev. 535, 545), without limitation or qualification, and be bound by an unconscious waiver of the effect of all manner of frauds, which in fact produced the marriage contract. Nor does it introduce a single exception to the above rule, in the interest of justice, and close the door to all other reasonable exceptions, in disregard of fundamental principles applicable to contracts generally. Exceptions to the effect of general rules often indicate that the rule is unsound and should be abrogated.

Whether a party to a marriage is prevented from impeaching its validity on account of fraud, by his lack of sufficient diligence in attempting to ascertain the truth or by his "blind credulity" (2 Kent Comm. 77) in representations which prove to be false, presents a question of fact, which is involved in all cases of fraud, and is usually determined by a consideration of what reasonable prudence would require under the circumstances. *Sipola* v. *Winship,* 74 N. H. 240, 248. If one has done all that men in general would do to ascertain

the fact sought, it could not be said that he incurred the penalty of a blind credulity in relying upon the statements of the other party as to a matter which both of them understood was material to the marriage contract and to their future happiness.

According to the facts reported, the plaintiff made the fact of the defendant's previous chastity an express condition of his promise to marry her. She understood this and unequivocally asserted that she was a chaste and virtuous woman, which was false. The contract was entered into and the marriage was celebrated in view of this condition, which was understood to be material to the future happiness of the parties as husband and wife. She made the representation of her chastity with the intent to deceive him and to induce him to marry her. Upon these facts no reasonable doubt can be entertained that the plaintiff is entitled to a decree of nullity.

*Exceptions overruled.*

PARSONS, C. J., and YOUNG, J., concurred: PEASLEE, J., concurred in the result: PLUMMER, J., was absent.