GRACE PEPPERINO BERARDINO, Plaintiff, *v.* LOUIS BERARDINO, Defendant.

Supreme Court, Oneida County, May 23, 1935.

*Salvador J. Capecelatro,* for the plaintiff.

SENN, Official Referee. The plaintiff and the defendant were married in the city of Utica on January 11, 1931. Plaintiff was then twenty-two years of age. She had known the defendant about three months. She had never kept company with any one else. She was living with her parents, who were of Italian birth. Under their custom the consent of the parents was required before she could marry. The father conducted a grocery store and meat market in Utica. He owned the building and she had been working for him.

Subsequent to the marriage the parties cohabited until some time about July, 1933.

The fraud upon which plaintiff relies as ground for annulment consists of representations made by defendant to the plaintiff and to her parents to obtain her and their consent to the proposed marriage. He seems to have done most of his talking to the father, but there were conversations at which all were present.

The sum total of his representations was that he wanted to marry the plaintiff; that he loved her and would continue to do so; that he would take good care of her the same as her parents had taken care of her; that she would not have to work; that he had a good job

and quite a little money in the bank; that he had enough to support her; that they (plaintiff and defendant) would have a business; and that he had no personal bad habits.

He did not state what his job was, what kind of business he proposed to engage in, how much money he had in the bank, nor what means he had to engage in business or support a wife.

It does not appear that the defendant then had any bad habits nor whether he had any money in the bank. He did have a job.

Concerning his consent to the marriage, the father testified: "When I talked to him I believed he was a good boy, a good man, well, I don't know, a nice young fellow, he look to me good, that is the way I thought; I said 'Grace, you marry him, Louis all right, I think.' She said 'I think he appears good, if you like him, father, I marry him' and she marry him."

Relying upon his statements and the advice of her parents, plaintiff married the defendant. For a time they lived with her parents. After a couple of months, according to plaintiff, he started abusing her, calling her names, and telling her that he did not care for her. "Two weeks after he quit his job and did not work after then."

Thereafter, plaintiff's widowed sister, Mrs. Johanna Giannin, a music teacher, made arrangements to induce defendant to go back and live with plaintiff. She took $5,000, nearly all she had, and purchased a building in which plaintiff and defendant were to live and start a store and she furnished the means to start the store. For a short time the parties got along in the store, but the defendant wanted plaintiff to work in the store and cut the meat. After that he would go out and not come back for three or four days at a time, became abusive, striking plaintiff, calling her names, and telling her that he did not care for her. On July 7, 1933, he abandoned the store and property and left the plaintiff. He did not return to her.

Efforts on the part of her father to induce him to come back and for a reconciliation failed.

Morally and ethically there is much justification for plaintiff's desire to have the marriage annulled, and I would gladly grant the relief asked if I could legally do so.

It is elementary that not every erroneous or untruthful or vainly boasting statement made as an inducement to marriage is ground for annulment, but the fraud for which such relief will be granted must be serious and of such import that it goes to the very essence of the marriage contract, as in *Minner* v. *Minner* (238 N. Y. 529) where defendant represented that he was of the same religious faith as the plaintiff and that he had never been married before, when in fact he had married a woman two years before from whom he had never been divorced and who might be and probably was still

living; or as in *Beard* v. *Beard* (238 N. Y. 599) where plaintiff was induced to marry the defendant by false representations as to her chastity; or in *Svenson* v. *Svenson* (178 N. Y. 54) where the defendant had concealed the existence of a venereal disease which he had; or in *DiLorenzo* v. *DiLorenzo* (174 N. Y. 467), cited by plaintiff's counsel, where defendant led the plaintiff to believe that he was the father of her child, when in fact there was no child; or in *Sheridan* v. *Sheridan* (186 N. Y. Supp. 470), cited for plaintiff, where defendant never intended to and never did cohabit with the plaintiff, his sole interest being to obtain what money he could from her; and in *Keyes* v. *Keyes* (6 Misc. 355), cited for plaintiff, where the defendant represented himself to be an honest man, when in fact he was a professional thief whose picture was in the rogues' gallery and he was then serving a sentence in Clinton Prison.

In the latter case the court stated that if the misrepresentation had been as to the defendant's social position, rank, fortune, manners, or the like, they would have furnished no ground for declaring the marriage void. " Fabrications and exaggerations of this kind, while not commendable, are so common as to be tolerated by the law on grounds of public policy." (*Keyes* v. *Keyes, supra.*)

The strongest authority for plaintiff is the comparatively recent one of *Shonfeld* v. *Shonfeld* (260 N. Y. 477). It was a case where the plaintiff and defendant had kept company for seven years. Defendant, the woman, had several times broached the subject of marriage to the plaintiff. Each time he told her that he was in no position to marry on account of not being financially able to make a living for himself and a wife. There came a time when he had an opportunity to get into a partnership business, but $8,000 was required. A friend was able to contribute only $1,500 or $2,000. When defendant was made acquainted with this fact she told the plaintiff that she had $8,000 which would be available. From this point on she took part in the discussions with reference to the proposed business and approved the partnership arrangements and the plans of the store. A lease of the store was to be closed on July twenty-first. A deposit by way of security was required. The defendant refused to furnish any money before marriage. There was a civil marriage on July fifteenth which was never consummated, each party returning to the parents' home where each lived. On July nineteenth plaintiff went to defendant's home to secure the amount of the required deposit. He then discovered that she did not have and never had any such money or the means of getting it. These facts were held to be sufficient grounds for an annulment. The court evidently went further in the way of a broad or liberal construction of the word " fraud " than it had ever done before.

I believe in view of its being a four to three decision, strongly dissented from in a minority opinion, it may properly be regarded as a " border-line " case and probably went as far as the court is likely to go in that direction. However, it was a case where there was a definite offer of something which the defendant knew she was entirely unable to produce and there was no cohabitation.

It differs from the instant case, in that here the representations were indefinite and were not shown to be altogether untrue. He had a job, may have had some money in the bank, and it is probable that he then loved the plaintiff, or thought he did. There was nothing promised as a condition to her marrying him to be withheld if she refused. And they cohabited long after she knew the facts about him.

With much respect for the plaintiff's counsel, I feel that I must refuse the relief asked. To grant it I would have to go beyond the doctrine of the *Shonfeld* case and open the door to a line of annulment actions not contemplated by the laws of New York.

I feel sorry for the plaintiff, but as stated by the court in *Keyes* v. *Keyes (supra)*, " Nothing born of the law will prevent indiscreet and unsuitable marriages."

Annulment denied.