Jiri Janda appeals from a judgment of the Baldwin Circuit Court annulling his marriage to Antoinette Walters Janda. We affirm.
 Background
On February 14, 2007, Antoinette filed a petition for an annulment of her marriage to Jiri. In support of her petition, Antoinette asserted that Jiri, a native of the Czech Republic, had fraudulently induced her to marry him; that, at the time of the marriage, Jiri had no intention of honoring his marital obligations; and that Jiri had married her only so that he could obtain a "green card," which would permit him to remain in the United States. Jiri answered the complaint, denying those allegations; he counterclaimed for a divorce.
The Baldwin Circuit Court conducted a hearing on May 8, 2007, at which both parties appeared pro se and presented ore tonus evidence. At that hearing, Antoinette testified that she and Jiri were married on June 5, 2005, after a courtship of only a few months. She also testified that she and Jiri had "honeymooned" by camping in the Smokey Mountains; that, throughout their honeymoon, they had had no sexual relations; and that they had slept in separate tents the entire time. She further testified that, when they returned to live in her home in Baldwin County, Jiri would not share a bedroom with her.
Antoinette testified that throughout their marriage she and Jiri had never had a sexual relationship of any kind. Antoinette initially believed that their differing expectations regarding a sexual relationship resulted from cultural differences. Antoinette testified that she eventually asked Jiri about the lack of a sexual relationship between them, and, according to Antoinette, Jiri had reported that he was unhappy with Antoinette's weight. Antoinette then lost 65 pounds, but, she testified, Jiri still showed no romantic interest in her. Antoinette testified that, after 20 months of marriage, she realized that Jiri had married her never intending to engage in marital intercourse with her.
According to Jiri's testimony, he is a native of the Czech Republic. He came to the United States in October 2001.[1] Jiri *Page 436 
claimed that he became a permanent resident of the United States as a result of his marriage to Antoinette. Jiri acknowledged that if his marriage to Antoinette was annulled, he would be deported back to the Czech Republic. Jiri testified that if his marriage was terminated by divorce, rather than by annulment, whether he could remain in the United States was "between him and the immigration service."[2]
Jiri denied that he had proposed to Antoinette; he claimed that Antoinette had proposed to him in March 2005. He agreed that they had married in June 2005 and that he and Antoinette had purchased a grill and a television together after they were married. Jiri acknowledged that he had voluntarily quit working at some of his jobs. Jiri also admitted that he was unhappy with Antoinette's weight, with the difficulties Antoinette experienced with her 19-year-old son, and with changes that had occurred in Antoinette's personality and behavior following a hysterectomy. Jiri testified that he had maintained his own bedroom because Antoinette was "messy" while he was tidy. Jiri also complained that Antoinette at times would mistakenly call him by her son's name.
The trial court entered an order annulling the marriage on May 8, 2007, specifically finding that the parties had not consummated the marriage and had not acted as a married couple, but had acted more as roommates, during their marriage. Jiri appeals, asserting that the trial court should have entered a judgment of divorce rather than an annulment.
 Analysis
In this appeal, we must determine whether the trial court properly annulled the marriage of Jiri and Antoinette. Under long-standing Alabama caselaw, a court may annul a marriage because of fraudulent inducement going to "the essence of the marriage relation." Williams v. Williams, 268 Ala. 223,226, 105 So.2d 676, 678 (1958); Hyslop v. Hyslop,241 Ala. 223, 226, 2 So.2d 443, 445 (1941); and Rata v.Rata, 214 Ala. 391, 392, 108 So. 11, 12 (1926). The existence of fraud is a question for the trier of fact — in this case, the trial court — to determine. See,e.g., Mall, Inc. v. Robbins, 412 So.2d 1197 (Ala. 1982);State Farm Mut. Auto. Ins. Co. v. Borden, 371 So.2d 28
(Ala. 1979); and Bracewell v. Bryan, 57 Ala.App. 494,329 So.2d 552 (Ala.Civ.App. 1976). This court may not predicate error on a finding of fact based on oral testimony unless that finding is plainly and palpably wrong, without supporting evidence, or manifestly unjust. Parks v. Martinson,694 So.2d 1386, 1389 (Ala.Civ.App. 1997); and Howard v.Pike, 290 Ala. 213, 216, 275 So.2d 645, 647 (1973).
In Hyslop v. Hyslop, supra, the Alabama Supreme Court addressed extensively the issue of annulment on the basis of fraudulent inducement:
 "`"The public policy of this state, evidenced by the statutes, the decisions, or the general consensus of opinion, does not regard a fraudulent marriage ceremony as sacred and irrevocable by judicial action; it does not encourage the *Page 437 
practice of fraud in such cases by investing a formal marriage, entered into in consequence of deceit, with all the force and validity of an honest marriage. While marriage is a contract attended with many important and peculiar features in which the state is interested, and while it is one of the fundamental elements of social welfare, its transcendent importance would seem to demand that wily and designing people should find it difficult to successfully perpetrate fraud and deceit as inducements to the marriage relation, rather than that such base attempts should be regarded as of trivial importance and be wholly disregarded by the courts. Unhappy and unfortunate marriages ought not to be encouraged. Sch. Dom. Rel. § 24. The successful perpetration of fraud is not deemed to be a subject for judicial encouragement."'
 ". . . .
 "Well considered cases, dealing with facts quite similar to this case are Millar v. Millar, 175 Cal. 797, 167 P. 394, L.R.A.1918B, 415 Ann. Cas.19188, 184 [(1917)]; Anders v. Anders, 224 Mass. 438, 113 N.E. 203, L.R.A.1916E, 1273 [(1916)]. See, also, 38 C.J. p. 1300.
 ". . . .
 "Few, if any, kinds of fraud or trickery will warrant a nullity suit, after the marital status is actually entered upon by cohabitation and marital intercourse has intervened.
 "But, following the lead of our case of Raia v. Raia, [214 Ala. 391, 392, 108 So. 11, 12 (1926)], supported by sound reason and authority, we are of opinion that entering into the marriage covenant by ceremonial marriage is an express declaration of a purpose to fulfill the marriage vows; that, if done with intent not to perform, followed by immediate disavowal and refusal to perform, the party is guilty of fraud which goes to the essence of the marriage relation; and no public policy denies the wronged party relief by a nullity suit."
Hyslop, 241 Ala. at 225-26, 2 So.2d at 444-45 (quotingGatto v. Gatto, 79 N.H. 177, 184, 106 A. 493, 497
(1919)). See also Williams, 268 Ala. at 225-26,105 So.2d at 678 (quoting Hyslop).
We note that in both Williams, supra, and Hyslop,supra, the Alabama Supreme Court cited with approval the case of Millar v. Millar, 175 Cal. 797, 167 P. 394
(1917). We find Millar to be directly on point. In that case, the California court annulled the parties' marriage, after eight months of cohabitation, because the wife had refused to engage in a sexual relationship with her husband since the date of their marriage ceremony. The California court concluded that, despite the parties' cohabitation, the wife's secret intent to refuse to matrimonial intercourse provided a proper basis for an annulment. The court stated:
 "Marriage is defined by our Civil Code as `a personal relation arising out of a civil contract, to which the consent of parties capable of making that contract is necessary.' . . . As we have seen, our law provides that when such consent on the part of either party is obtained by `fraud,' the marriage may be annulled at the suit of the other, unless the fraud is waived by free cohabitation after discovery; in other words, such marriage is voidable at the instance of the injured party. . . . [W]hile the contract is simply that the parties forthwith enter into the relation of marriage, `the rights and obligations of that status [relation] are fixed by society in accordance with the principles of natural law.' These principles of natural law are perfectly understood, certainly in so far as the particular matter here involved *Page 438 
[sexual relations] is concerned. The obligation of the relation in this behalf is such . . . as to be `essential to the very existence of the marriage relation,' a proposition as to which there appears to be no dissent in the authorities. . . . It may readily be conceded that a court should not annul a marriage on the ground of fraud except in extreme cases, where the particular fraud goes to the very essence of the marriage relation, and especially is this true where the marriage has been fully consummated and the parties have actually assumed all the mutual rights and duties of the relation. In such a case considerations of public policy intervene, and the courts are loath to annul a marriage. . . . But no consideration of public policy precluding relief exists under such circumstances as are established by the findings in this case, and the authorities generally recognize that in such cases the marriage should be annulled for fraud. . . .
 "That the law provides for the dissolution of the relation of marriage by divorce for specific violations after marriage by one party of duties appertaining to the relation, including the particular obligation here involved, is altogether immaterial. Such subsequent violations in no way go to the original validity of the marriage. The alleged fraud in this case is not based upon any mere violation of any duty of the marriage relation, but upon a fraudulent misrepresentation made by plaintiff at the time of the marriage, by which the consent of Millar to enter into the marriage was obtained, a matter, as we have seen, which goes to the original validity of the marriage, and renders it, at the suit of the injured party, void ab initio."
175 Cal. at 802-05, 167 P. at 396-97.
Despite the age of these cited cases, we find no reason, and none has been urged in this case, to depart from their long-standing recognition of the nature of the marital relationship, the public policy attendant to that relationship, and the impact of a fraudulent intent, held at the time of the marriage, upon that relationship. We agree with Millar
that a fraud perpetrated at the time of the marriage and going to the essence of the marital relationship renders the marriage voidable by the injured party. See Williams, supra, andHyslop, supra (both citing Millar with approval). Also, as recognized in Millar, supra, we agree that traditionally a sexual relationship is implicit in marriage vows and that an unstated intent, held at the time of the marriage ceremony, to utterly refuse to engage in a sexual relationship with the other party is a fraud that alters the very essence of the marriage.[3] See Millar,175 Cal. at 802, 167 P. at 398-99. Finally, the continued viability of the principles stated above is evidenced by their application in more recent cases from other jurisdictions.[4] *Page 439 
In this case, the trial court heard testimony indicating that, immediately after the marriage ceremony, Jiri refused to share a bed with Antoinette and refused to engage in sexual relations with her. Antoinette testified that she had remained in the marriage because she originally believed Jiri's reluctance to engage in marital intercourse with her resulted from cultural differences between them. Jiri subsequently told Antoinette that he would not engage in marital intercourse with her because of her weight. However, after Antoinette lost 65 pounds, Jiri persisted in his refusal to engage in marital intercourse with her. Antoinette testified that, after some 20 months of marriage, she realized that Jiri had married her never intending to engage in marital intercourse with her. Upon that realization, she petitioned the court for an annulment. As recognized in Millar, supra, these circumstances gave rise to a marriage that was voidable by Antoinette. By filing her petition, Antoinette sought to void her marriage to Jiri.
We acknowledge that, because of the length of time the parties cohabitated together, this is a close case and could have been resolved either way. However, the trial court resolved the evidence in favor of an annulment. Because the ore tenus rule applies and because the record contains substantial evidence to support the trial court's judgment, we will not disturb that judgment. See Parks v. Martinson, 694 So.2d at 1389
(recognizing that this court will not predicate error on a trial court's findings of fact, based on ore tenus evidence, unless those findings are palpably wrong, without supporting evidence, or manifestly unjust); and Howard v. Pike,290 Ala. at 216, 275 So.2d at 647 (accord). We, therefore, affirm the trial court's judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.
[1] It appears that Jiri was in the United States on a temporary green card, valid for two years, before or at the time of his marriage to Antoinette. Jiri testified that he had visited the United States on two other occasions, once in 1996 and again in 1997. On those occasions, he had obtained "B2" tourist visas; Jiri also testified that, at one point, he had applied for a temporary work permit.
[2] We presume Jiri's reference to "immigration service" refers to the Immigration and Naturalization Service ("the INS"), formerly a separate agency within the United States Department of Justice. After the 2002 reorganization required by the Homeland Security Act of 2002, Pub.L. No. 107-296, § 451, 116 Stat. 2135, 2192 (Nov. 25, 2002), the INS is now referred to as the "Bureau of Citizenship and Immigration Services."
[3] By this language, we simply recognize that a sexual relationship of some degree is assumed and implicit in the relationship between a husband and a wife, unless the circumstances or an express agreement between the parties indicates otherwise.
[4] See, e.g., In re the Marriage of Meagher, 131 Cal.App.4th 1, 7, 31 Cal.Rptr.3d 663, 667 (2005) (recognizing that annulments on the basis of fraud are generally granted only in cases in which the fraud related in some way to the sexual or procreative aspects of marriage); In re Marriage ofLiu, 197 Cal.App.3d 143, 155-56, 242 Cal.Rptr. 649, 656-57
(1987) (annulling marriage because wife had fraudulently induced husband into marriage so that the wife could obtain a "green card"); Stojcevska v. Anic (No. 210144, Jan. 11, 2000) (Mich.Ct.App. 2000) (not reported in Mich. App. or N.W.2d) (annulling marriage, upon wife's request, because evidence indicated that wife's parents had arranged her marriage to her cousin so that he could obtain a visa to United States);V.J.S. v. M.J.B., 249 N.J.Super. 318, 320,592 A.2d 328, 329 (Chan.Div. 1991) ("Where the marriage has been consummated, the fraud of defendant will entitle plaintiff to an annulment only when the fraud is of an extreme nature, going to one of the essentials of marriage."); Bishop v. Bishop,62 Misc.2d 436, 308 N.Y.S.2d 998 (N.Y.Sup.Ct. 1970) (denying husband's petition for annulment based on fraudulent inducement; court found no fraud in wife's attempt to obtain a divorce and in her refusal to consummate the marital relationship because husband himself testified that he and wife had agreed they would marry and then immediately divorce; such an agreement did not contemplate marital intercourse).