WILLIAM BOLMER, petitioner,

*v.*

GENEVIEVE S. EDSALL, otherwise GENEVIEVE BOLMER.

[Decided March 28th, 1919.]

1. Sexual intercourse is not only a marital right, but also a marital obligation.

2. Where one of the parties to a marriage ceremony determines aforethought that he or she will not engage in sexual intercourse with the other after marriage, and does not disclose it to the other, and carries out such determination, the offending spouse commits a fraud in the contract of marriage affecting an essential of the marital relation, against which the injured party may be relieved by annulment of the marriage in this court under its general equity jurisdiction, dissociated from its statutory power to annul for specified causes.

3. Corroboration considered; especially with reference to the probative force of a marriage certificate.

4. Corroboration is required in suits for nullity of marriage as well as in those for divorce from the bonds of matrimony.

5. B. and E. went through a ceremony of marriage on board a steamship plying between two ports of the Republic of San Domingo; it not being shown in what country the vessel was owned, registered or whose flag she flew; *quære*, under the laws of what state or country was the marriage ceremony performed.

6. As the ships of a nation, wherever they may be, are considered a part of its territory: *semble*, that a marriage ceremony performed upon a ship, whether upon the high seas or within the territorial waters of a foreign nation, is governed by the laws of the nation where the ownership of the vessel resides, whether it be a government vessel or a merchantman.

7. The validity of a marriage is determined by the *lex loci contractus*, and is dissolvable by the *lex domicilii*.

8. In nullity cases, as well as in those for divorce, it should appear to the satisfaction of the court that the proceeding is not the result of collusion; but collusion is not lightly or rashly to be presumed. In a case in which the party or parties swear that there is none, it will be presumed that collusion does not exist, unless the contrary is made to appear.

9. In a cause for nullity of marriage under the general equity powers of the court of chancery, the first decree for the petitioner must be a decree *nisi*, under *P. L. 1916 p. 109*, assimilating the practice and procedure in such suits to those for nullity of marriage under the provisions of the Divorce act. *Rev. of 1907.*

On exception to master's report.

*Mr. Frank B. Jess,* for the exceptant.

WALKER, CHANCELLOR.

This is an *ex parte* suit for annulment of a marriage. The special master has reported adversely and petitioner excepts.

The parties were married October 19th, 1917, and lived together little more than four weeks. They never had sexual relations.

The claim of the petitioner is that the wife before marriage conceived the idea of denying him sexual intercourse after marriage; never intended to permit him to copulate with her, and carried out that intent; that this constituted a fraud in a material part of the marriage contract and rendered it void.

The special master submits to the court that our Divorce act does not authorize a dissolution of marriage on the ground taken by the petitioner; that this court has always confined itself in annulling marriages, for causes not specified in the statute, to such as were not *de facto* marriages, because void; and he further submits that the marriage of these parties was not void for want of contract; that its annulment is sought for cause which did not exist at the time of marriage, but arose since, and that such cause is not a circumstance going to the validity of the marriage and therefore not ground for annulling it.

Since the status of marriage is conferred by contract, and since for avoiding contracts equity has jurisdiction over all questions of fraud, if such an impediment has entered into a marriage a court of equity will pronounce it void. This is not the rule in England, because formerly there was there an express jurisdiction in the ecclesiastical courts, and now there is in the divorce court. *2 Bish. M., D. & S.* § *803.*

We never had ecclesiastical courts in New Jersey, and with us the jurisdiction to annul for fraud resides in this court.

In *Carris* v. *Carris, 24 N. J. Eq. 516,* the court of errors and appeals held that the court of chancery under its general power to annul fraudulent contracts, has jurisdiction to annul a contract of marriage for sufficient fraud. And Chancellor Magie

in *Crane* v. *Crane, 62 N. J. Eq. 21,* held that to annul for a fraudulent representation inducing the contract, the fraud must affect an essential of the matrimonial relation. Vice-Chancellor Lane in the very recent case of *Davis* v. *Davis, 90 N. J. Eq. 158,* annulled a marriage because the defendant was suffering from hereditary chronic tuberculosis at the time of the ceremony, which fact he withheld from the petitioner, fearing that if she knew it she would not marry him, and pointed out that this court will annul a marriage imposed upon one party by false representations of the other in respect to an essential of the contract, unless it appears that to do so would be against good policy, sound morality and the peculiar nature of the marriage relation. It is most obvious that the case at bar does not fall within the exceptions stated.

In the case *Anonymous, 24 N. J. Eq. 19,* it was held by Chancellor Runyon, that this court will annul a contract of marriage, outside of its statutory jurisdiction, where the contract is void. In this case (Anonymous) the chancellor refused to annul a marriage for impotence on the part of the husband which existed at the time of the marriage, had continued ever since and was incurable; and this for the reason stated by Bishop, whom he quotes, that is, because impotence is a canonical defect which only makes the marriage voidable and not void until sentence of nullity is pronounced. Our legislature subsequently bestowed the power on this court to annul marriages for such impotence. The cause for nullity pleaded in the case at bar is no canonical defect; in fact it is no defect at all. It is a fraud practiced by one of the parties upon the other affecting the contract in its inception. If it does not fall within the class of cases in which this court may annul for fraud the injured party is remediless.

On the question that marriage is regarded in this state as a civil contract and that our court of equity will entertain suits to set aside such contracts on the ground of fraud, see *Vanderbilt* v. *Mitchell (Court of Errors and Appeals, 1907), 72 N. J. Eq. 910* (at *p. 918*).

The master in his correct summary of the testimony says that the petitioner deposed that defendant at all times refused him

sexual intercourse, although he attempted it, saying, first, that she could not, and, second, that the act was disgusting to her; and, further, he said she told him she had made up her mind on the question before leaving Philadelphia to go to San Domingo, where, on the boat on which she made the voyage, they were married, between the ports of La Romana and Macoris, Republic of San Domingo. She was called as a witness by the petitioner, which is allowable (*McCauley* v. *McCauley, 88 N. J. Eq. 392*), and testified that she knew what the married state entailed in regard to sexual relations, and that before the wedding she made up her mind not to consummate the marriage, and that prior to the ceremony she never communicated this determination to the petitioner.

If these facts be true, then, to my mind, this woman perpetrated a palpable fraud upon this man in withholding from him information that she did not intend to submit to his sexual embraces, thereby depriving him of an absolute marital right. It may be safely asserted that Mr. Bolmer would not have gone through a marriage with Miss Edsall had he known that she had previously determined to make the ceremony a mockery.

In *McClurg* v. *Terry, 21 N. J. Eq. 225*, it was held by Chancellor Zabriskie that *intention* is necessary in a marriage as well as in every other contract.

In *True* v. *Ranney, 21 N. H. 52, 56*, a suit for nullity on the ground of the female's imbecility, prosecuted by next friend, the court observed that throughout the civilized world the *willing mind* is required as an essential attribute of the contract of marriage.

In *Clark* v. *Field, 13 Vt. 460*, the supreme court of the State of Vermont (at *p. 467*), speaking of the power of chancery to annul a marriage, remarked that the necessity of such jurisdiction was apparent, and that the court apprehended that it falls within the ordinary equity jurisdiction to relieve against contracts obtained by fraud, or where *one* or both of the parties were *deceived*. And, again (at *p. 468*), that it would be very singular if the court may relieve against all other contracts obtained by fraud or imposition, and could not relieve from this contract

when obtained by such means, when *consent was not given under-standingly and the marriage was not consummated.*

The master.ends his report with the observation that, in view of his conclusion, it was unnecessary to express any opinion as to what credence was to be given to the testimony of the parties; whether or not the wife's testimony alone is sufficient corroboration upon which to base a decree of nullity, or whether there is collusion between the parties.

*G— v. G—, L. R. 2 P. & M. 287, 291; 40 L. J. (1871) Pro. & Mat. (N. S.) 83,* was a question of nullity of marriage. Mrs. G. instituted a suit for judicial separation on the ground of cruelty. The respondent denied the charge and alleged that the marriage had never been consummated by reason of the incapacity of the petitioner, and prayed for a decree of nullity. Lord Penzance observed that it is clear that without sexual intercourse the ends of marriage, the procreation of children and the pleasures and enjoyments of matrimony cannot be attained; that the invalidity of the marriage, if it cannot be consummated on account of some structural difficulty, is undoubted, but the basis of the interference of the court is not the structural defect, but the impracticability of consummation, and if, therefore, a case presents itself involving that impracticability (although it may not arise from a structural defect), the reason for the interference of the court arises. The impossibility need not be technical, but it must be practical; it cannot be necessary to show that the woman is so formed that connection is physically impossible, if it can be shown that it is possible only under conditions to which the husband would not be justified in resorting, among which is brute force.

In this case (*G— v. G—*) it does not appear that there was any fraud inducing the contract, with reference to the wife's unwillingness or inability to submit to sexual intercourse, but rather that the trouble was discovered after marriage, which would be ground for nullity for impotence under our statute, if the difficulty were structural. But this makes no difference, as the ecclesiastical courts in England had power in both classes of cases, and that jurisdiction was devolved upon the present divorce court by act of parliament; and the judge ordinary in *G—*

v. G— had no occasion to consider any question of jurisdiction. It is true that the power to annul and divorce resides in the same court in this state, but that is a mere coincidence, the legislature having bestowed the power to divorce upon our court having inherent jurisdiction to annul.

The defendant's testimony coincides with that of the petitioner, but by our Divorce law that cannot be laid hold of as corroboration, unless her testimony is itself corroborated.

In *Garrett* v. *Garrell, 86 N. J. Eq. 293*, I adverted to the inflexible rule in this state that a divorce will not be granted upon the uncorroborated testimony or admission of a party to the suit; and held that as a decree cannot be granted upon the uncorroborated testimony of the petitioner, or upon the defendant's uncorroborated confession, it follows that such uncorroborated testimony plus such uncorroborated confession amount to no more than each standing alone and are insufficient and not legal evidence; that while both are admissible in evidence, each must be corroborated in order to be effective as evidence in the cause.

I assume that if the wife's testimony corroborates her husband's, and hers is corroborated, that corroborates his.

Now, the parties to this suit, petitioner and defendant, were the only witnesses sworn (except a solicitor who had been consulted by defendant, but whose testimony did not affect the merits) and, as the petitioner's uncorroborated testimony will not entitle him to a decree, and as the defendant's admissions do not amount to the corroboration the law requires, it follows that if there is to be a decree the testimony of one or both of these parties must be corroborated.

If the defendant would submit to a physical examination of her person for the purpose of showing whether or not the marriage had been consummated, and the result showed that she was still a virgin, this would corroborate the petitioner's testimony.

The court may order an inspection. *Shafto* v. *Shafto, 28 N. J. Eq. 34; Bid. N. J. Div. Pr. (2d ed.) 55; 14 Cyc. 661*, and *note 78*. And if the defendant were a resident of New Jersey, and within the reach of the process of this court, inspection, which, presumably, would afford corroboration, might be compelled.

The gravamen of the complaint before me, namely, the denial of sexual intercourse, is not the only element in the proofs necessary to be corroborated. There are three essentially requisite things in a divorce suit necessary to be corroborated, and a nullity suit falls within the same rule (*Crane* v. *Crane, 62 N. J. Eq. 21)—first,* marriage; *second,* residence, and *third,* cause of action.

Without marriage there can be no breach of matrimonial duties, no suspension or dissolution of a marital relation which does not exist; therefore, in every divorce suit there must be a marriage and it must be proved; the decree in effect and in form affirms the marriage and declares the separation or dissolution; and this doctrine applies to all suits for setting up, declaring null, dissolving or in any way modifying a marriage status. *2 Bish. M., D. & S.* §§ *732, 733, 734, 737.* And in a suit for nullity the object whereof is to obtain a judicial declaration that what was supposed or claimed to be a marriage did not constitute matrimony, the ceremony or other like thing sought to be set aside, must be proved. *Ibid.* § *737.*

A ceremony of marriage involved in a nullity suit, I take it, requires the same sort of proof, and no more, than is required to establish a marriage in a suit for divorce from the bonds of a valid one. It is conceded that proof of a marriage for the purpose of dissolving it may be much less strict than that required to prove residence or the cause of action. It is hardly to be presumed that anyone would assert a marriage for the purpose of undoing it. If it did not exist it would be, so to speak, already undone. However, under our law, there must be some corroboration to the parties' assertion of the fact of marriage. Mr. Bishop says that if the officiating person gives to the parties at the marriage a certificate of the fact, where there is accompanying parole proof of the transaction, it is admissible in evidence as of the *res gestæ. 1 Ibid.* § *1006.*

Now, in the case at bar the parties both testified to the solemnization of the marriage by the ship's surgeon, who, they said, was also a clergyman. The defendant testified that she had the marriage certificate at home and would be willing to produce it. This would be all-sufficient according to our daily practice in

divorce cases in which the fact of marriage is not contested, if this were a domestic marriage. Proof of the official character of the person celebrating the marriage seems not to be exacted unless challenged. However, the possible difficulties surrounding the proof of a ceremonial marriage may be obviated by proof of cohabitation and repute. *1 Ibid.* §§ *1041, 1059, 1064; Ojserkis v. Ojserkis, 62 Atl. Rep. 113.* The parties appear to have boarded in the house of a Mr. Bass, at La Romana, where they occupied a room together containing twin beds for the period of a month. But the ceremony which was performed on board the steamship Algonquin, between the ports of La Romana and Macoris, in San Domingo, may require the sanction of foreign law to support it.

The petitioner testified that they were married on shipboard because the laws of San Domingo required things that they could not comply with, namely, the establishment of a residence and the posting of banns three separate times, leaving the notice up a week each time. It is not shown under what country's laws the ship Algonquin was registered or what flag she flew, nor is it shown whether the marriage took place within the territorial waters of San Domingo, or upon the high seas. If within the former, did the marriage come under the laws of the Republic of San Domingo, and if upon the high seas, and the Algonquin was an American vessel, did the marriage fall under the laws of the state of the union in which the petitioner, or defendant, was domiciled?

Marriage being a universal right, if, at any place where the parties may be, whether permanent or transient, they enter into a marriage by the law of the place, they will be everywhere throughout Christendom holden to be husband and wife; but if the transaction is not regarded as a marriage where it occurs, it will not be deemed such in any other country. Marriage as to its constitution is governed by the *lex loci contractus*, and as to its dissolution by the *lex domicilii. 1 Ibid.* §§ *838, 839.* Therefore, if the validity of a marriage be drawn in question at the domicile of the married persons, yet, if it were celebrated abroad, its validity must be tried by reference to the law of the country where the marriage had its origin. *1 Ibid.* § *856.*

The jurisdiction of nations extends into the ocean to one marine league from low water mark on the shore. *12 Cyc. 214; Manchester v. Massachusetts, 139 U. S. 240; 35 L. Ed. 159; 164.* In English-speaking countries a league is estimated at three miles. *Webs. New Int. Dic. 1227.* The rivers, havens, bays and other arms of the sea extending into a state or country are within the jurisdiction of such state or country. *12 Cyc. 215; Manchester v. Massachusetts, supra; Attorney-General v. Hudson County Water Co., 76 N. J. Eq. 543.* But, the high seas being common to all mankind, vessels afloat upon it are regarded as parts of the territory of the nations whose flag they fly and to which they belong, and crimes committed on such vessels on the high seas are exclusively within the jurisdiction of that nation. *12 Cyc. 215.* And, moreover, the ships of a nation, *wherever* they may be, are considered a part of its territory. *Ben. Adm. (4th ed.) § 2,* citing *The Hamilton, 207 U. S. 398,* which was not a government vessel but a merchantman. *S. C. sub nom. Old Dom. Steamship Co. v. Gilmore, 52 L. Ed. 264, 270.*

An American vessel is deemed a part of the territory of the state within which its home port is situated, and, as such, a part of the territory of the United States. *In re Ah Sing, 13 Fed. Rep. 286.* Acts committed by master and crew would undoubtedly be decided by the law of the flag, that is, the country of the ship's ownership and registry. See *Mayer's Adm. L. & P. 50.* A steamship owned by a corporation of New Jersey is a vessel of that state and subject to its laws, notwithstanding its registry in New York. *Int. Nav. Co. v. Lindstrom, 123 Fed. Rep. 475.*

Assuming that the steamship Algonquin was an American vessel, it would seem from the admiralty law that the validity of the marriage ceremony performed upon it between these parties on October 19th, 1917 would depend upon the law of the state of the Union in which the vessel was registered or where it was owned, and, according to the view hereafter expressed, it would be treated as being as valid as though performed according to the laws of this state, where the petitioner had his legal domicile. But if the steamship were a vessel not of the

United States, but of a foreign country, the validity of the marriage would have to be determined by the laws of that country, and we could not, I think, assume that its laws were the same as ours, but would require proof of them. And if the steamship were owned and registered in San Domingo, then, from what appears in the case, it would seem that the marriage was void, as the testimony discloses the fact that the parties determined to be married on shipboard to avoid the laws of that Republic, which require domicile and the posting of banns.

I do not wish to be understood as expressing an opinion as to the validity of this marriage ceremony. The questions which I have raised about it are such as are apparent in the record, and if the cause is to be further proceeded with according to leave hereinafter granted, it may be to the advantage of counsel to know that in my view it ought to be shown where, and under what sovereign's laws, the marriage took place, and if out of the United States and in a foreign country, the marriage laws of that country.

As the validity of a marriage depends upon the ceremony being performed in conformity with the *lex loci contractus,* if this one were performed within the jurisdiction of the Republic of San Domingo it would seem to be void for want of conformity with the laws of that country, in which event it may be dissolved here by the *lex domicilii;* but, apparently, it was not performed in San Domingo.

In the courts of this country, I have been able to find but one case of a marriage on board a vessel at sea, and that is in *Hynes* v. *McDermott, 7 Abb. N. C. 98,* where it was held by the New York common pleas (*affirmed, 22 Alb. L. J. 367; 10 Week. Dig. 508*) that in the absence of any evidence it could not be presumed that a vessel plying across the English channel, on which an American citizen contracted a marriage, was of a nationality which would subject the contract to a law different from that of New York. The married couple were, in that case, found by a jury to have entered into an agreement in London to be then and thenceforward man and wife, which was followed by recognition by the husband, cohabitation and birth of offspring, the husband being at the time a citizen of

the State of New York, temporarily sojourning in England; that that agreement was made with a *bona fide* intention to contract a valid marriage according to the laws of New York and to return to that state to reside there with his wife. ·

Law, as I understand it, has no extra-territorial force, and I therefore fail to see how a party's intention that a marriage contract entered into in the Kingdom of England could be given validity by the law of New York, even if such party were an American citizen domiciled in New York.

A few days after the occurrence just mentioned the parties to that contract of marriage sailed for France, and while on a steamboat crossing the English channel they repeated the same promises in their stateroom. Indulging the same presumption as to the Algonquin that the New York common pleas did with reference to the vessel crossing the English channel (as the testimony in this case is not full, and must be supplemented if the cause is to be proceeded with), proof as to the country where the vessel is owned should be made. . The court in *Hynes* v. *McDermott* was reviewing a record on appeal to which presumably nothing could be added. I am pointing to difficulties in one that may be treated as incomplete, and which may be supplemented.

A case of possible marriage at sea was adverted to in *Holmes* v. *Holmes, 1 Abb. U. S. Rep. 525,* in which it is stated in the syllabus, that citizens of a state whose laws impose restrictions upon the mode of celebrating a marriage, cannot purposely go to a place beyond its jurisdiction, and not within the jurisdiction of another state—as, for instance, *at sea*—and there contract a marriage in a manner contrary to the laws of the state of their residence, and afterwards have such marriage sustained by the courts within it; that such an attempt to be joined in marriage should be deemed a fraudulent evasion of the laws to which the parties owe obedience, and ought not to be held valid. And the judge observed (at *p. 543*) that the marriage (in that case) might have taken place at sea where there were no civil regulations prescribing specified forms and ceremonies as necessary to give validity to the consent of the parties.

Nothing in the *Holmes Case,* it seems to me, applies in the case at bar. The petitioner here, Mr. Bolmer, happened to be temporarily in the Republic of San Domingo, working as a civil engineer, and the defendant went down there determined to marry him, if the parties are to be believed, and I think they are; however, they are not corroborated; but that may be supplied.

In the case at bar there was no going to a place beyond the domicile of the parties for the purpose of evading its laws and contracting a marriage contrary to those of their residence—no fraudulent evasion of the laws to which they owed obedience. His presence in San Domingo was on a business errand, and hers on an errand of love whose Platonic character was undisclosed to him before marriage, but rudely manifested to him afterwards, to the destruction of his domestic peace and happiness. The presence of both on the ship and in the insular Republic was without *mala fides.*

It will be noted that the judge who wrote the opinion in the *Holmes Case* took no account of the doctrine of the flag—that is, that ships of a country carry its sovereignty onto the seas, and, apparently, into the territorial waters of a foreign country.

I think the apprehension expressed in the *Holmes Case* that there are no civil regulations at sea prescribing specified forms and ceremonies of marriage, is not well founded. It is literally true, but the law operates upon subjects or citizens wherever they may be, at sea or on shore, and it seems to me as valid a marriage can be celebrated in the cabin of a ship at sea as in the drawing room of a mansion on shore. The law obtains over a given area of land or water belonging to a particular country, and operates upon people within that area. It equally obtains and operates in and upon a ship on the high seas. This appears to be borne out in *Du Moulin* v. *Druitt, 13 Ir. C. L. 212,* which was the case of a marriage on a British transport ship on the high seas; and by *Culling* v. *Culling (1896), L. R. P. D. 116,* where the marriage occurred on a British man of war at a foreign station.

Although the several states of the Union are independent sovereigns with reference to their divorce laws, yet there is a

general similarity in their laws regarding the contract of marriage, and marriages performed in any one state are quite universally recognized in all the states.

In the law of divorce in this state, where, on the hearing of *ex parte* cases, proof has been offered of a marriage in another state, I have never known a question to be raised by this court as to the validity of the marriage according to the laws of the state where the ceremony was performed. It is, I think, universally regarded in *ex parte* cases that a marriage celebrated in another state was legally performed, and is therefore valid here as well as there; and in the absence of a denial of its validity in a litigated case, it seems that proof is not required of the law of the state where the marriage occurred.

Then, too, the residence of the petitioner, necessary to clothe this court with jurisdiction, has not been corroborated. The petitioner says he lives near Rocky Hill, New Jersey, where he has resided continuously since 1898 with his mother. If this be so, and presumably it is, the means of abundant corroboration must be available to him.

On this subject of corroboration, especially as it relates to the cause of action in this case, it may be helpful to observe that corroboration, in order that a divorce may be decreed, need not be testimony given by another or other witnesses to all of the same identical facts to the minutest particulars, but only such facts and circumstances as will make the testimony believable. *Orens* v. *Orens, 102 Atl. Rep. 436.* And corroboration need not be the testimony of witnesses; it may be furnished by surrounding circumstances adequately established. *Rogers* v. *Rogers, 104 Atl. Rep. 32.*

I am unable to spell anything out of the case which would seemingly show that the parties, or either of them, were not credible witnesses; and nothing appears in the case to suggest collusion.

In *Sickles* v. *Carson, 26 N. J. Eq. 440,* Chancellor Runyon observed (at *p. 442*) that the bill was not accompanied by an affidavit against collusion as required by the statute in divorce cases, nor was there any evidence that the application was not

collusive; and although an affidavit of non-collusion is not required in these cases, yet in the nature of the contract and character of the relief sought there is abundant reason for requiring, in nullity cases, that it should appear to the satisfaction of the court that the proceeding is not the result of collusion, as all of the reasons for requiring evidence of *bona fides,* and guarding the court against imposition in suits for divorce, apply equally to actions to annul contracts of marriage. To this I agree. But collusion is not to be lightly or rashly presumed.

There could be no presumption of collusion in this case without charging the petitioner and defendant with false swearing, for each was examined on that question, and each testified that there was no collusion between them. Besides, there is an affidavit of non-collusion appended to the petition in this case. This is now required in this class of cases by *P. L. 1916 p. 109.* The talk between the parties in which the petitioner told the defendant that he wanted her to live with him or know that she would not, and, since she would not agree, he was going to take the matter to court; and her going to the hearing before the master, with counsel whom she had consulted, and testifying upon the call of petitioner's counsel, do not suggest a case of collusion under any of the tests laid down in *Sheehan* v. *Sheehan,* *77 N. J. Eq. 411.*

The result reached is, that a cause of action for nullity of marriage is presented and that this court has jurisdiction of it under its general equity powers, and of the parties, on the believable though not controlling evidence. There is, however, no corroboration of the marriage, the residence of the petitioner or of the cause for action; and there is no evidence of collusion between them. In this posture the petitioner may have liberty to take further testimony, or may dismiss this petition without prejudice, as he may be advised.

The exception will be sustained; and the special master's recommendation that the petition be dismissed will be overruled.

SUPPLEMENTAL MEMORANDUM.

[Filed June 27th, 1919.]

The result reached, in my opinion in this case, was that a cause of action for nullity of marriage was presented and that the court had jurisdiction of the parties, and of the cause under its general equity powers, on the believable, though not controlling, evidence; there being no corroboration of the marriage, of the residence of the petitioner, or of the cause for action. In that posture the petitioner was given liberty to take further testimony or to dismiss his petition without prejudice. He chose the former course and has taken further testimony. A perusal of this evidence discloses that the petitioner's case has been corroborated in the respects above mentioned; including proof of the ship's ownership and registry being in this country, and he is therefore entitled to a decree. It must be a decree *nisi*.

The Divorce act of 1907 (*P. L. 1907 p. 474* § *20*) provided that if, after hearing, the plaintiff was entitled to a decree annulling the marriage, or a decree for divorce from the bonds of matrimony, a decree *nisi* should be entered; and which, by section 21, should become absolute after the expiration of six months unless appealed from or cause was shown to the contrary. That may have applied only to the causes for nullity under that act which were—(1) prior marriage and a living spouse at the time of the subsequent marriage; (2) that the parties were within the degree prohibited by law; (3) physical and incurable impotence at the time of marriage; (4) incapacity for consent, and (5) non-age. In *Bid. N. J. Div. Pr.* (*2d ed.*) *279 et seq.*, are forms of decrees *nisi* in the cases of prior marriage, impotency, non-age and incapacity to consent. In the case at bar the cause for nullity is one under the general jurisdiction of equity and is not any one of the causes for nullity provided for in the statute; but, by an act regulating the practice and procedure in suits for annulment of marriages under the general equity jurisdiction of the court (*P. L. 1916 p. 109* § *2*),

it is provided that the same practice and procedure shall be followed as required in suits or actions for annulment of marriage under the provisions of the Divorce act (*Rev. of 1907.*), it being the intent and purpose of the act of 1916 to make uniform the practice and procedure in all causes of annulment of marriages, and it provides, in section 3, that appeals shall be taken from decrees *nisi* and not final decrees. Here is an express provision that the first decree in a nullity suit under the general jurisdiction of the court shall be a decree *nisi,* the same as in nullity cases under the statutory provisions.

Decree *nisi* accordingly.