ELSIE STACKHOUSE HARDING, *Appellant*, v. IRA S. HARDING, *Respondent.*[1]

*Wright & Wright*, for appellant.

*Ballinger, Clark & Force*, for respondent.

[1]Reported in 118 P. (2d) 789.

JEFFERS, J.—Elsie Harding instituted this action for divorce against Ira S. Harding, in the superior court for King county. Seattle-First National Bank (Broadway Branch) and Harbor Plywood Company, a corporation, were also made parties to the action, and an accounting of all money in their possession owing to the community was asked as against these last named defendants.

The grounds for divorce, as alleged in the complaint, are:

"That on the night of October 10, 1940, the defendant Ira S. Harding viciously assaulted the plaintiff, kicking her and beating her until she is permanently injured, by reason of which it is no longer possible for the parties to live together as husband and wife."

Defendant, Ira S. Harding, by his answer admitted that the parties were married June 22, 1940; that there were no children born as the issue of such marriage; that each of the parties has certain separate property; that this defendant had some money in Seattle-First National Bank, and some money due from Harbor Plywood Company; that an altercation with plaintiff took place on the night of October 10, 1940; that both plaintiff and defendant were injured thereby; and that the parties can no longer live together. Defendant denied the other allegations of the complaint.

In his cross-complaint, defendant Harding alleged that the parties were married at Olympia, June 22, 1940; "that said marriage has never been consummated"; that defendant has considerable separate property consisting of household furniture, furnishings, and effects, together with a 1935 two door Ford sedan and numerous tools and equipment; that defendant has advanced to plaintiff and made improvements upon certain real property held in the name of plaintiff, and acquired by her prior to this marriage.

It is further alleged that, on the night of October 10, 1940, plaintiff viciously assaulted defendant, severely injuring him and causing him by reason thereof to leave the premises; that plaintiff resisted consummation of the marriage, and the parties have never assumed a marital relationship. Defendant then asked for a divorce on the grounds of cruelty.

Plaintiff by her reply denied the affirmative matter set up in the cross-complaint.

The matter came on for hearing before the court, and at the conclusion of the case the court stated:

"Well, in so far as the facts surrounding this fight that they had that night, it has been testified to by both parties. I would accept Mr. Harding's statement as to what occurred there as establishing the true facts; but, even if I do that, it does not excuse him for the terrible mauling that he gave her, because, of course, that is inexcusable. I would like to accept further the fact that he did advance various sums that he said that he did advance in improving the property of Mrs. Harding. I don't think that it was done against her wishes. She might not have wanted it particularly, but I think that she was willing to have it done. . . .

"There is nothing that I can do further than grant to the plaintiff a divorce on the ground of cruelty. I will make no allowances in the matter at all for her support or otherwise, because I feel the improvements on the place made by the community and by Mr. Harding offset any claim that she might have. Mr. Harding will pay the costs of the entry of the decree. That will be the decision of the court."

On March 19, 1941, the trial court filed a memorandum opinion as follows:

"After consideration I have come to the conclusion that I was mistaken in granting a divorce to the plaintiff for the reason that the evidence established that the marriage had never been consummated, due to the refusal of the plaintiff to enter into marital relations with the defendant and her refusal to cohabit with him.

"(1) Any improvement made upon plaintiff's real property by the defendants shall belong to the plaintiff wife without compensation therefor to the defendant husband.

"(2) That all of the personal property belonging to the defendant prior to the marriage ceremony and after said marriage taken to the residence of the plaintiff, and which said property was directed to be returned to him by order of the court, shall be the property of said defendant, free from any claim thereon on the part of the plaintiff, and he may recover the same wherever he may find it.

"(3) That the money remaining in the defendant bank shall be the property of the defendant husband.

"(4) That defendant is entitled to a decree of annulment on his cross-complaint, and that he recover his costs.

"Findings of fact, conclusions of law and decree in accordance herewith may be presented for signature."

On March 27, 1941, the court made and filed its findings of fact and conclusions of law, and, on April 19, 1941, its decree of annulment on defendant's cross-complaint. Motion for new trial was timely filed by plaintiff and denied, and on May 7, 1941, plaintiff gave notice of appeal from the decree entered.

Error is based on the court's refusal to grant a divorce to appellant; on making and entering findings of fact Nos. 3, 4, and 5; on refusing to award to appellant her portion of the accumulation of the community during marriage; on entering judgment against appellant for costs; on refusing to award appellant counsel fees and costs; and on entering a decree of annulment in favor of respondent.

Before discussing the questions presented in this case, we shall set out some of the facts relative to this unfortunate matrimonial venture.

At the time these parties were married, appellant was fifty-two years of age, weighing about one hundred thirty pounds; respondent was sixty-six years of age,

weighed two hundred seventy pounds, and was six feet three inches tall. At the time of the marriage, appellant owned a five acre tract at Riverton Heights, on which there was a new house, and also an old house and an orchard. Respondent owned no real property, and was in the business of building water tanks. Appellant's version of this marriage was as follows:

"Well, that was why we were married. It was a business proposition from the beginning. We agreed to more or less go in business together. I had been in this water district for a good many years, had good connections, and we figured that we could make a go together. I was to become a member of Harding & Company. In fact, he had stationery printed to that effect. I was to take care of the office and he was to do the ground work. That is what happened. I did all that. I done errands, ran back and forth between Seattle and Aberdeen, doing whatever was necessary to be done with the job."

On cross-examination, Mrs. Harding was asked the following question: "Was this marriage ever consummated? Did you ever have marital relationship with Mr. Harding?" to which she replied, "No, sir."

Appellant's claim of cruelty is based upon the assault made upon her by Mr. Harding on the night of October 10, 1940. Some idea of the unmerciful beating inflicted on appellant by respondent on this occasion may be obtained from the testimony of Dr. John Thorp, who examined appellant. This witness testified:

"She had,—both eyes were blackened. There was a subconjunctival hemorrhage of both eyes. The nose was discolored and swollen. I thought fractured. Bruises over both ears and over the forehead. Bruises over the left side of the neck below the mastoid process. An area of swelling about the size of an egg behind the left ear. A large bruise on the upper right arm. Another bruise covering the whole of the extensive surface of the right forearm and hand. Two bruises on the upper left arm. Other large bruises covering the

lateral one-third of the left side of the back. A bruise over the sternum about three inches by two inches. Many other small bruises scattered through different parts of the body."

It is not denied but that appellant was confined to her bed for some time after this occurrence, and she claims, among other things, that her eyes have been permanently affected. The testimony is undisputed that appellant finally got away from respondent and ran downstairs and out into the yard, where she stayed until respondent left the house; that respondent attempted to follow her but turned his ankle or hurt his leg on the stairs and was apparently unable to go on.

Respondent himself testified on direct examination:

"Q. Did you see the condition she was in from the fight? A. I did. Q. How badly was she bruised? A. The worst of anybody I ever saw."

Respondent attempts to justify his assault by stating that appellant assaulted him, and that, because of the pain caused by her assault, he lost his head. The testimony shows that there were some scratches inflicted by appellant on or in the vicinity of respondent's privates, during the altercation of October 10th. Carl Johnson, a witness for respondent, to whom respondent showed these scratches, testified that they did not look too bad; that the skin was scratched off.

It seems to us the first question which must be answered is whether or not, under the law and the facts of this case, the trial court was justified in granting a decree of annulment. It should be kept in mind that neither party had asked to have the marriage annulled, but both had asked for a divorce on the ground of cruelty.

Rem. Rev. Stat., § 983 [P. C. § 7502], provides:

"When there is any doubt as to the facts rendering a marriage void, either party may apply for, and on proof obtained, a decree of nullity of marriage."

Rem. Rev. Stat., § 8449 [P. C. § 3708], provides:

"When either party to a marriage shall be incapable of consenting thereto, for want of legal age or a sufficient understanding, or when the consent of either party shall be obtained by force or fraud, such marriage is voidable, but only at the suit of the party laboring under the disability, or upon whom the force or fraud is imposed."

It is interesting to note that the two sections above set out have remained unchanged since 1881.

Appellant contends there are no facts shown in this case, and none found by the trial court, which would justify a decree of annulment, further contending that this marriage was not void or even voidable, and that a decree of annulment cannot be granted where there has been a valid marriage, citing *Delpit v. Young,* 51 La. 923; *Chipman v. Johnston,* 237 Mass. 502, 130 N. E. 65; and *Medrano v. State,* 32 Tex. Crim. App. 214, 22 S. W. 684.

Respondent, on the other hand, contends this marriage was procured by fraud on the part of appellant, in that before the marriage and down to the time of separation, appellant had the settled intention of denying to respondent his conjugal rights. Respondent cites, among others, the following cases to sustain his contention: *Bolmer v. Edsall,* 90 N. J. Eq. 299, 106 Atl. 646; *Anders v. Anders,* 224 Mass. 438, 113 N. E. 203, L. R. A. 1916E, 1273; *Millar v. Millar,* 175 Cal. 797, 167 Pac. 394, Ann. Cas. 1918E, 184, L. R. A. 1918B, 415; and *Coppo v. Coppo,* 163 Misc. 249, 297 N. Y. Supp. 744.

Under the authority of *Buckley v. Buckley,* 50 Wash. 213, 96 Pac. 1079, 126 Am. St. 900, and *Sortore v. Sortore,* 70 Wash. 410, 126 Pac. 915, it would seem that the trial court had jurisdiction to enter a decree of nullity, if the facts warranted it, even though the complaint or cross-complaint did not specifically ask for that relief, but asked for a divorce.

We have never held in this state that a marriage could be declared a nullity because of a failure to consummate the marriage by cohabitation, nor have we been cited to any cases that so hold. The cases hereinbefore referred to, and cited by respondent, do hold that, where one of the parties to a marriage ceremony *determines before the ceremony* that he or she will not engage in sexual intercourse with the other after marriage, not disclosing such intention to the other, and carries out such determination, the offending spouse commits *a fraud in the contract of marriage* affecting an essential of the marital relation, against which the injured party may be relieved by annulment of the marriage.

We do not think the cases hereinbefore referred to as cited by appellant are helpful herein. Appellant also cites *In re Hollopeter,* 52 Wash. 41, 100 Pac. 159, 132 Am. St. 952; *Cushman v. Cushman,* 80 Wash. 615, 142 Pac. 26; and *Tisdale v. Tisdale,* 121 Wash. 138, 209 Pac. 8. These cases deal with the question of who may bring an action to annul a marriage, and the age of consent. None of the cited cases reaches the question here involved.

Appellant also cited *Nordlund v. Nordlund,* 97 Wash. 475, 166 Pac. 795, L. R. A. 1918A, 59, and *Bishop v. Bishop,* 133 Wash. 522, 233 Pac. 918. In the *Nordlund* case we held that denial to the husband by the wife of sexual intercourse for twelve years, without sufficient grounds or cause, was ground for a divorce, upon the theory that the denial of this right constituted cruelty, under the statute. The *Bishop* case adds nothing to what was said in the *Nordlund* case. These cases do not deal with the question of annulment.

■■ This was not a void marriage, in that neither of the parties was prohibited from entering into the marriage relation because of any express statutory

provision. Was this, then, a voidable marriage, because of fraud on the part of appellant, which fraud entered into the marriage contract, and affected an essential of the marital relation?

Let us now look to the cases cited by respondent to sustain his contention that sufficient fraud was shown in the instant case to warrant a decree of nullity. In the *Bolmer* case, *supra,* the husband testified that his wife at all times refused to have sexual intercourse with him, and the wife, called as a witness, testified that before the wedding she made up her mind not to consummate the marriage, that prior to the ceremony she did not communicate this determination to her husband, and that she did not have intercourse with her husband after marriage.

In the *Anders* case, *supra,* the court granted a decree of nullity on the ground of fraud. In that case the facts show that the wife went through the marriage ceremony with an intention never to perform any one of the duties of a wife. She went through the ceremony solely to secure a right to bear the name of a married woman, and in that way hide the shame of having had an illegitimate child, intending to leave her husband, who was not the father of her child, at the church door, and not see him again. That plan she carried into effect.

In the California case of *Millar v. Millar, supra,* the facts disclosed and the court found that, at the time of the marriage, the wife did not intend to consummate the marriage, in that she did not intend to have sexual relations with her husband; that she entered into the marriage contract for the purpose of obtaining maintenance, support, and property from the defendant, and without any intent on her part to perform the obligations of the contract of marriage; that after the

marriage the plaintiff refused to have sexual intercourse with her husband, without any reasonable excuse, and refused to occupy the same bed with him. In the cited case, it was stated that a marriage should be annulled on the ground of fraud only in extreme cases.

We think it apparent from the facts in the cited cases that it has been only in extreme cases that courts have annulled marriages on the ground of fraud. We are of the opinion that, under facts such as shown in the cases cited by respondent, the authorities quite generally hold that a decree of nullity may be granted, and, while we are of the opinion that, under Rem. Rev. Stat., § 8449 [P. C. § 3708], facts might be shown justifying a court in annulling a marriage for fraud, at the instance of the party upon whom the fraud was imposed, we are satisfied there was no evidence in this case justifying the court in granting a decree of nullity on the cross-complaint of respondent.

In this case there is no admission by appellant that she entered into the marriage ceremony with the intent not to carry out the duties and obligations imposed upon her, nor does respondent say that she ever informed him that such was her intent. It is true appellant says this was more or less of a business arrangement, and she admits they never had sexual intercourse after marriage. It is also true that respondent testified that he attempted five or six times to have such relation with appellant, but that she would not permit it.

We think the most that the testimony shows is that after the marriage appellant refused to allow respondent to have intercourse with her, although in answer to a direct question as to whether or not during the marriage respondent endeavored to function, appellant

answered, "He would get ideas once in a while, but never go through with it."

We are also of the opinion the trial court erred in refusing to grant a divorce to appellant on the ground of cruelty. In our opinion, there could be no justification for such an assault as respondent made upon appellant. We are of the opinion that appellant was entitled to a divorce on the ground of cruelty. We are also of the opinion that, while respondent, under the allegations of his cross-complaint and the proof herein, was not entitled to have the marriage annulled, he was also entitled to a divorce on the ground of cruelty.

We have examined the record with care, in order to determine whether or not the trial court's determination relative to property rights of the parties is supported by the evidence.

There were three contracts, which respondent had entered into with various parties, to build water tanks, and it is the proceeds received from these contracts in which appellant claims she should be entitled to share. Respondent testified that he made a profit of about $1,400 from what is referred to as Riverton Heights job. This contract was entered into and the work started about April 8th, which was prior to the marriage. Respondent also testified that he received $1,690 from the Ames Terminal job, and that he cleared about $404.29 on this contract. The third contract was referred to as the Harbor Plywood job, at Aberdeen. He testified that he received $6,036.25 gross for this job, and made a profit of about $836.34.

It further appears that, during this marriage, respondent gave appellant various amounts in cash for her personal use, and for household expenses, and that a considerable amount was spent from the proceeds of these contracts on permanent improvements to ap-

pellant's property. There is at this time the sum of $51.52 in the Seattle-First National Bank of Seattle.

The trial court did not make a specific finding relative to the receipts and disbursements of community funds, other than to find that "the defendant [respondent] caused numerous improvements to be made to plaintiff's premises and maintained and supported the plaintiff."

Our statement as to the receipts and expenditures of community funds is as nearly accurate as it was possible for us to make it from the evidence. It is admitted that, after the trouble of October 10th, and prior to the time this action was started, which was four days later, respondent drew out about eight hundred dollars from the bank, leaving only $51.52. It does not appear that appellant had any funds, at least community funds, with which to prosecute this action.

We are satisfied, as we think the record discloses the trial court was also satisfied, that, from the gross proceeds from these jobs, respondent paid bills for labor and material used on the jobs, and that the net proceeds were used in meeting the expenses of the home and the personal expenses of appellant and respondent, and in permanently improving appellant's property. We are therefore in accord with the trial court's finding that at this time the community property consists of $51.52 in the bank, and an electric range and heater.

We are in accord with the trial court's conclusion that appellant should have accorded to her, free and clear of any claim by respondent, the real property acquired by her prior to marriage, and described in her complaint, together with the improvements placed thereon during this marriage, including the electric range and heater.

We are further of the opinion that respondent is en-

titled to the possession of certain personal property consisting of furniture and effects, tools and equipment, and a 1935 Ford sedan, which property the court has heretofore ordered returned to him, free from any claim of appellant.

We are unable to agree with the trial court that the testimony shows respondent has not obtained possession of all the above described property, in or on the property of appellant, where the parties resided during their married life of three months. The testimony shows that, after the order was made, requiring that respondent's property be returned to him, he or his agent went to the home of appellant and took therefrom five truckloads of furniture and effects. Appellant testified that respondent was allowed to take everything belonging to him, while respondent claims there are certain articles he was not allowed to take and did not take. The testimony is indefinite as to just what respondent took and just what he claims appellant still has belonging to him. This is evident from the fact that, while the trial court stated that respondent was entitled to the possession of his personal property wherever he might find it, the court did not attempt to set out what this property consisted of.

Leaving the judgment in this form would, in our opinion, only be a source of further trouble between the parties. We are satisfied that the evidence does not warrant the finding or conclusion that appellant now has in her possession or under her control any personal property belonging to respondent.

We are also of the opinion that the sum of $51.52 now in Seattle-First National Bank (Broadway Branch) should be awarded to appellant. No allowance for costs will be made to either party in the lower court. Appellant will recover her costs in this court.

The judgment of the trial court is reversed, and the

cause remanded, with instructions to the trial court to enter findings, conclusions, and judgment in accord with this opinion.

ROBINSON, C. J., BLAKE, SIMPSON, and BEALS, JJ., concur.

[No. 28547. Department Two. November 4, 1941.]