**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 82311-6-I |
| MARIO TODOROV, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| and | ) | PUBLISHED OPINION |
| | ) | |
| HANH PHUONG HA, | ) | |
| | ) | |
| Respondent. | ) | |

BOWMAN, J. — Mario Todorov appeals an order dissolving his marriage to Ha Phuong Hanh.[1] Todorov contends the court erred when it refused to grant his petition to invalidate the marriage. We conclude the trial court did not abuse its discretion when it determined annulment was not warranted because Ha did not induce Todorov to marry her by making a fraudulent misrepresentation involving the essentials of marriage. We affirm the final dissolution decree.

FACTS

Todorov grew up in the United States and Ha grew up in Vietnam. Todorov's mother and Ha's mother were friends for more than 35 years and corresponded often. In 2015, Todorov traveled to Vietnam with his mother and met Ha for the first time. The couple expressed a romantic interest in each other,

---

[1] The case caption reflects the title of the case as it was in the trial court pursuant to RAP 3.4. However, following traditional Vietnamese naming conventions, Ha's full name is Ha Phuong Hahn.

Citations and pin cites are based on the Westlaw online version of the cited material.

No. 82311-6-I/2

so Todorov visited Ha again in 2016.  During that visit, Todorov asked Ha if she had been in any prior relationships.  She told him no.  The two began discussing marriage plans in late 2016.  In early 2017, Todorov applied for a K-1 visa[2] to bring Ha to the United States.

Ha arrived in the United States on August 6, 2017.  Her K-1 visa allowed 90 days for the couple to marry.  But Ha asked Todorov to get a marriage license the next day and he agreed.  Ha and Todorov married on August 10, 2017, the first allowable day after Washington's mandatory 3-day waiting period.  The two did not consummate the marriage on their wedding night; they slept in separate bedrooms.  They were sexually intimate only once, toward the end of August 2017, and even then did not spend the entire night together in the same room.  Ha did not show any affection or warmth toward Todorov in private or in public.  Todorov soon became suspicious about Ha's motives in marrying him.

On September 5, 2017, Todorov used a friend's phone to search Ha's social media posts.[3]  He saw a photograph of Ha holding hands with another man in February 2016.  Other photographs showed Ha with the same man several times between February 2016 and August 5, 2017, the day she left Vietnam.  Ha also seemed to suggest in her posts that she was coming to America only to study and did not mention her marriage to Todorov.  Todorov immediately moved out of the family home.[4]

---

[2] A K-1 visa allows a United States citizen to bring a foreign fiancé to the United States to get married.

[3] Ha blocked Todorov from seeing her social media posts.

[4] Ha moved out of the home on September 10, 2017.

2

No. 82311-6-I/3

Todorov petitioned the court for an order invalidating the marriage. Ha separately petitioned the court to dissolve the marriage. The court consolidated the petitions and the case proceeded to a bench trial.

At trial, Todorov told the court he would have "[d]efinitely not" married Ha if he knew she had a boyfriend. Todorov explained, "That is very critical" because marriage is a permanent "sacred bond" in his religion. He claimed Ha entered the union with bad intentions, and he did not believe they had a "true marriage." According to Todorov, Ha blocked his access to her social media to prevent him from learning about her relationship with another man, and "[b]y omitting that information, she essentially lied to me in the beginning, throughout, and after." Finally, he told the court he felt like he "was being used as a means to come to the United States."[5]

Ha denied that Todorov ever asked her "about [her] relationship status" in 2015 or 2016. Ha said she wanted to marry right away after arriving in America because Todorov had taken only two weeks off from work and her mother's visa was good for only a month. Ha believed that the marriage ceremony was only to make the union official and that the couple would celebrate with a formal wedding later.

Ha told the court that after they married, she did not feel comfortable sharing a room with Todorov because her mother was sleeping on the living room sofa just outside his room. She wanted to wait until the current home renovations finished, giving the couple their own private room downstairs. She

---

[5] Todorov does not assert this argument on appeal.

No. 82311-6-I/4

also stated she grew unhappy in the marriage when it became apparent to her that Todorov "married . . . me because of money." He wanted her to pay for things like home repairs, a new car, and a down payment on a house.

Ha admitted she was "in a relationship prior to meeting" Todorov. She first testified that she ended the relationship before she met Todorov. But on cross-examination, Ha admitted the relationship lasted until she agreed to marry Todorov in late 2016. Ha denied that she was "in a relationship with [the man] all the way up to August 5, 2017," the day she left Vietnam.

The court found Todorov to be a credible witness and adopted much of his testimony in its findings of fact. It concluded that Ha "was dishonest by omission" about her relationship with another man, that Todorov relied on that misrepresentation, and that Todorov would not have married Ha if he had known the truth. But the court ruled that Ha's misrepresentation, while hurtful to Todorov, was not a fraud involving the essentials of marriage under RCW 26.09.040(4)(b)(i). The court denied Todorov's petition to invalidate the marriage and granted Ha's petition for dissolution.

Todorov appeals.

ANALYSIS

Todorov alleges the trial court erred when it denied his petition to annul his marriage to Ha. He claims Ha induced him to marry her through a fraudulent misrepresentation involving the essentials of marriage. We disagree.

We review a trial court's decision on a petition to invalidate or dissolve a marriage for a manifest abuse of discretion. In re Marriage of Landry, 103 Wn.2d

4

No. 82311-6-I/5

807, 809-10, 699 P.2d 214 (1985). A trial court abuses its discretion if its decision is manifestly unreasonable, based on untenable grounds, or based on untenable reasons. In re Marriage of Urbana, 147 Wn. App. 1, 9-10, 195 P.3d 959 (2008). We review the trial court's interpretation of a statute de novo. In re Marriage of Watson, 132 Wn. App. 222, 230, 130 P.3d 915 (2006).

Marriage is a civil contract. RCW 26.04.010(1). But statutes determine the legal duties and rights of married parties. Wash. Statewide Org. of Stepparents v. Smith, 85 Wn.2d 564, 569, 536 P.2d 1202 (1975). Public policy favors presuming a marriage is valid based on "the interest of society . . . in maintaining the integrity of the family as a social unit." See Davis v. Davis, 3 Wn.2d 448, 453, 101 P.2d 313 (1940); see also Woy v. Woy, 737 S.W.2d 769, 772 (Mo. Ct. App. 1987) (public policy demands preserving the integrity of the marriage contract so far as possible). As a result, a party seeking to annul a marriage contract bears the burden to show its invalidity by "clear, satisfactory, and convincing evidence." Thorne v. Farrar, 57 Wash. 441, 445, 107 P. 347 (1910).

Under RCW 26.09.040(4)(b)(i), a court must declare a marriage invalid if "a party was induced to enter into the marriage by . . . fraud involving the essentials of marriage"[6] and the parties "have not ratified their marriage by voluntarily cohabiting after . . . discovery of the fraud."[7] A court should grant

---

[6] In contrast, dissolutions require only a determination that the marriage is irretrievably broken. In re Marriage of Little, 96 Wn.2d 183, 192, 634 P.2d 498 (1981).

[7] The trial court found that the parties did not cohabit after Todorov discovered Ha's misrepresentation about her prior relationship. This unchallenged finding is a verity on appeal. In re Custody of A.T., 11 Wn. App. 2d 156, 158 n.4, 451 P.3d 1132 (2019).

5

No. 82311-6-I/6

annulment under RCW 26.09.040(4)(b)(i) in only extreme cases.  Harding v. Harding, 11 Wn.2d 138, 147, 118 P.2d 789 (1941).

Chapter 26.09 RCW does not define the term "essentials of marriage." We give undefined statutory terms their usual and ordinary meaning unless there is contrary legislative intent.  Dennis v. Dep't of Labor & Indus., 109 Wn.2d 467, 479-80, 745 P.2d 1295 (1987).  We may look to the dictionary to determine a term's ordinary meaning.  Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 528, 243 P.3d 1283 (2010).  The dictionary defines "essential" as "something basic or fundamental esp[ecially] belonging to or forming part of the minimal indispensable body, character, or structure of a thing."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 777 (2002).  Thus, a court must declare a marriage invalid if one party induced the other party to enter the marriage by fraud that goes to the indispensable body or structure of the marriage.

Harding is the only published Washington case that addresses what type of fraud involves the essentials of marriage.  In that case, our Supreme Court determined that where one of the parties to a marriage ceremony determines before the ceremony "that he or she will not engage in sexual intercourse with the other after marriage, not disclosing such intention to the other, and carries out such determination," such fraud goes to the essentials of the marriage. Harding, 11 Wn.2d at 145.

We agree with Todorov that Harding does not go so far as to limit the essentials of marriage to sexual intercourse.  As Todorov points out, Harding was decided in 1941, and the "modern trend" in some jurisdictions is to interpret the

6

No. 82311-6-I/7

term more broadly.[8]  For example, in New Jersey, misrepresentations about one's intent to have children relate to the essence of the marriage relationship. Tobon v. Sanchez, 213 N.J. Super. 472, 474, 517 A.2d 885 (Ch. Div. 1986); V.J.S. v. M.J.B., 249 N.J. Super. 318, 329-30, 592 A.2d 328 (Ch. Div. 1991). And in two states, courts found that fraudulent representations about religious convictions go to the essentials of the marriage when one party showed an inability to follow his religious tenets because of the fraud.  Wolfe v. Wolfe, 62 Ill. App. 3d 498, 506-07, 378 N.E.2d 1181 (1978), aff'd, 76 Ill. 2d 92, 389 N.E.2d 1143 (1979); Bilowit v. Dolitsky, 124 N.J. Super. 101, 103-04, 304 A.2d 774 (Ch. Div. 1973).

But no state has determined that misrepresentations about chastity involve the essentials of the marriage.  Indeed, the opposite is true.  California follows the traditional rule that "character, habits, chastity, business or social standing, financial worth or prospects, or matters of similar nature" do not affect the essence of marriage.  Schaub v. Schaub, 71 Cal. App. 2d 467, 476, 162 P.2d 966 (Dist. Ct. 1945); In re Marriage of Meagher, 131 Cal. App. 4th 1, 8, 31 Cal. Rptr. 3d 663 (2005).  Both Missouri and Nebraska conclude that courts do not consider chastity before the marriage as vital to the marriage relationship.  Woy, 737 S.W.2d at 774; Guggenmos v. Guggenmos, 218 Neb. 746, 752, 359 N.W.2d 87 (1984) (misrepresentation about ending a previous relationship did not go to the essentials of marriage).  And in Connecticut, even misrepresentation about a

---

[8] Todorov invites us to adopt a "subjective standard" in determining whether fraud involves the essentials of marriage.  According to Todorov, we should define what is essential on a case-by-case basis, looking only to "what was essential to the parties when they entered into their marriage."  We decline the invitation.

No. 82311-6-I/8

prior marriage does not inherently impair a marital union.  Fattibene v. Fattibene, 183 Conn. 433, 437, 439-40, 441 A.2d 3 (1981).

We agree with these jurisdictions that misrepresentations about chastity do not amount to fraud involving the essentials of marriage.  Here, Ha's misrepresentation about her prior relationship was not so extreme that it amounted to fraud involving the essentials of marriage, requiring annulment under RCW 26.09.040(4)(b)(i).  The trial court did not abuse its discretion in refusing to invalidate Todorov and Ha's marriage.

We affirm the final dissolution decree.[9]

WE CONCUR:

---

[9] Ha requests attorney fees on appeal under RCW 26.09.140.  But RAP 18.1(c) requires a party seeking attorney fees to "file a financial affidavit no later than 10 days prior to the date the case is set for oral argument," and she did not file a financial affidavit.  We deny Ha's request for attorney fees on appeal.

8